**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OAM PARKASH,                                )
2901 Gem Circle,                            )
Austin, TX 78704                            )
                                            )
      **Plaintiff,**                  )     **APPLICATION FOR PRELIMINARY**
                                            )     **INJUNCTION, OR, IN THE**
  **v.**                               )     **ALTERNATIVE, FOR EXPEDITED**
                                            )     **SUMMARY JUDGMENT**
CONDOLEEZZA RICE, Secretary of             )
State of the United States, in her          )
official capacity as well as her            )     **CIVIL ACTION NO.**
successors and assigns,                     )
U.S. Department of State,                   )     **AGENCY CASE NO. A098-586-297**
2201 C Street, N.W.,                        )
Washington, DC 20501-0001,                  )     **REQUEST FOR ORAL ARGUMENT**
                                            )
      **and**                        )
                                            )
MICHAEL B. MUKASEY, Attorney               )
General of the United States, in his        )
official capacity as well as his            )
successors and assigns,                     )
U.S. Department of Justice,                  )
950 Pennsylvania Avenue, N.W.,              )
Washington, DC 20530-0001,                  )
                                            )
      **and**                        )
                                            )
ROBERT S. MUELLER, III, Director,          )
Federal Bureau of Investigation,            )
In his official capacity, as well as his    )
successors and assigns,                     )
J. Edgar Hoover Building                     )
935 Pennsylvania Avenue N.W.,               )
Washington, DC 20535-0001                   )
                                            )
      **and**                        )
                                            )
EMILIO T. GONZALEZ, Director,              )
U.S. Department of Homeland                  )
Security, U.S. Citizenship and              )
Immigration Services, in his official       )
capacity, as well as his successors         )
and assigns,                                )
20 Massachusetts Avenue, N.W.,              )
Washington, DC 20529                        )
                                            )
      **and**                        )
                                            )
                                            )
                                            )
                                            )

**PAUL E. NOVAK, JR., Director,**
**Vermont Service Center,**
**U.S. Department of Homeland**
**Security, U.S. Citizenship and**
**Immigration Services, in his official**
**capacity as well as his successors**
**and assigns,**
**75 Lower Welden Street,**
**St. Albans, VT 05479-0001**

       **and**

**EVELYN C. UPCHURCH, Director,**
**Texas Service Center, U.S.**
**Department of Homeland Security,**
**U.S. Citizenship and Immigration**
**Services, in her official capacity as**
**well as her successors and assigns,**
**4141 North St. Augustine Road,**
**Dallas, TX 75227,**

       **Defendants.**


## APPLICATION FOR PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT

**To the Honorable Judges of Said Court:**

COMES NOW, Plaintiff, Oam Parkash, through his undersigned counsel, and alleges as follows:

## I. INTRODUCTION

1.      This is an Application for a Preliminary Injunction that is being filed against the defendants named above, seeking injunctive relief based upon the failure of the Federal Bureau of Investigation ("FBI") to complete Plaintiff's National Name Check Program clearance, which has unreasonably delayed any adjudication of Plaintiff's application for adjustment of status, filed by Plaintiff, pursuant to §245 of the Immigration and Nationality Act, 8 U.S.C. §1255 ("INA"), on **October 7, 2004** [more than two (2) years prior to this instant application].  *See*, Affidavit of Oam Parkash, dated December 17, 2007, a copy of which is attached and incorporated hereto as "Exhibit A."

2.      Plaintiff seeks a temporary and preliminary injunction against Defendants generally and specifically against the U.S. Secretary of State and the U.S. Department of State ("DOS"), to enjoin the DOS from assigning Plaintiff's immigrant visa number to another immigrant visa applicant.  Plaintiff's EB-1 Pakistan immigrant visa category ("visa category") allows for the processing of his application for adjustment ("adjustment application") under the DOS' December 2007 Visa Bulletin, but it is uncertain that this same visa category will be available on January 1, 2008 causing Plaintiff's adjustment application to be withheld from processing for an unknown period of time.  *See*, Visa Bulletin for January 2008 and Visa Bulletin for December 2007, copies of which are attached and incorporated hereto as "Exhibit B" and "Exhibit C."

3.      The denial of this Application for Preliminary Injunction will cause Plaintiff **irreparable harm** in that the processing of his adjustment application (which has already taken more than two (2) years) will be **further delayed for an unknown period of time**.  This delay will prevent Plaintiff from becoming a lawful permanent resident and accruing the necessary two (2) years of residence necessary for his application for naturalization, thus disenfranchising him from participation in the U.S. political process.

4.      **Plaintiff requests that this Honorable Court set a hearing on this Application for a Preliminary Injunction on or before Monday, December 31, 2007, or in the alternative, to hold an expedited hearing on a converted Motion for Summary Judgment on his Complaint for Writ of Mandamus on or before December 31, 2007.**

5.      In a separate Complaint for Writ of Mandamus, filed with this Court, Plaintiff seeks to compel Defendants, and those acting under the Defendants' direction, to complete his FBI National Name Check Program clearance (generating a "FBIQUERY System" response), which is required before the U.S. Citizenship and

Immigration Service ("USCIS") can adjudicate his application for adjustment of status pursuant to §245 of the INA, the Mandamus and Venue Act (28 U.S.C. §1361) ("Mandamus Act"), the Declaratory Judgment Act (28 U.S.C. §2201) and the Administrative Procedures Act (5 U.S.C. §551 and §701, et seq.) ("APA").  *See*, Complaint for Writ of Mandamus, filed December 18, 2007, a copy of which is attached and incorporated hereto as "Exhibit D."

6.    Attorneys fees and costs are entitled to Plaintiff pursuant to the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412(d), *et seq.*[1]

**II. PARTIES**

7.    Plaintiff, Oam Parkash, is an adult individual who is a national of Pakistan and resides lawfully in the United States. He resides at 2901 Gem Circle, Austin, TX 78704.  Exhibit A

8.    Dr. Condoleezza Rice is the U.S. Secretary of State and this action is brought against her in her official capacity only, as well as her successors and assigns.  She is generally charged with implementing U.S. foreign policy and is further authorized to delegate such powers and authority to subordinate employees of the Bureau of Consular Affairs ("BCA"), which is an agency within the Department of State.  The BCA is responsible for the issuance of visas to foreign nationals for entry into the U.S. and is also responsible for the tracking and allocation of visa numbers to foreign nationals.  The BCA releases a monthly Visa Bulletin that indicates when a foreign national may apply for a class of immigrant visas based on his or her visa priority dates.  Only visa applicants with a priority date earlier than the cut-off date listed for each category in the Visa Bulletin may be assigned a visa number and granted an immigrant visa.  Exhibits B and C

---

[1] *See*, Elkhatib v. Bulger, 2006 U.S. Dist. LEXIS 60485 (S.D. Fla. 2006) (fees granted after a plaintiff succeeded in his mandamus action seeking to compel the USCIS to adjudicate his adjustment application) and Aboushaban v. Mueller, 2007 U.S. Dist. LEXIS 15402 (N.D. Cal. 2006) (fees granted after the Court granted a plaintiff's writ of mandamus and ordered the USCIS to adjudicate his adjustment application).

9.      Michael B. Mukasey is the Attorney General of the United States and this action is brought against him in his official capacity only, as well as his successors and assigns.  He is generally charged with enforcement of the Immigration and Nationality Act, and is further authorized to delegate such powers and authority to subordinate employees of the FBI, which is an agency within the U.S. Department of Justice.  More specifically, Mr. Mukasey is responsible for overseeing the FBI's National Name Check Program ("NNCP"), which is mandated by Executive Order No. 10450.  Presently, every intending immigrant must complete an FBI NNCP screening before his or her adjustment of status application can be approved.  *See*, 22 C.F.R. §42.67(c)(2).

10.     Robert S. Mueller, III, is the Director of the FBI and is named herein only his official capacity, as well as his successors and assigns, and his duties include ensuring timely completion of all requests made by the USCIS for security clearances, including NNCP screenings. The FBI is headquartered at the J. Edgar Hoover Building, 935 Pennsylvania Avenue, NW, Washington, DC 20535-0001.

11.     Dr. Emilio Gonzalez is the Director of the USCIS, who is named here only in his official capacity, as well as his successors and assigns.  He is generally charged with the implementation of the Immigration and Nationality Act, and is further authorized to delegate such powers and authority to subordinate employees of the USCIS.  USCIS is specifically assigned the adjudication of immigrant visa petitions as well as applications for permanent residence status under §245 of the INA.  USCIS is headquartered at 20 Massachusetts Avenue, N.W., Washington, DC 20529.

12.     Defendants Rice, Mukasey, Gonzalez and Mueller are federal officers and agency heads who perform a significant amount of their official duties in the District of Columbia.

13.     Paul E. Novak, Jr. is the District Director of the Vermont Service

Center ("VSC") of the USCIS and is named herein only in his official capacity, as well

as his successors and assigns. Plaintiff properly filed his application for adjustment

of status with the VSC and that office retained his application for several years

before transferring his case to the Texas Service Center ("TSC"). USCIS, through its

headquarters in Washington, D.C., any of its four (4) service centers, National

Benefits Center, numerous Field Offices, numerous Sub-Offices and Application

Support Centers, has a mandatory duty to act on Plaintiff's application for adjustment

of status within a reasonable period of time.

     14.    Evelyn C. Upchurch is the District Director of the TSC and is named

herein only in her official capacity, as well as her successors and assigns. While

Plaintiff properly filed his application for adjustment of status with the VSC, the

USCIS unilaterally transferred Plaintiff's application to the TSC for processing.

USCIS, through its headquarters in Washington, D.C., any of its four (4) service

centers, National Benefits Center, numerous Field Offices, numerous Sub-Offices

and Application Support Centers, has a mandatory duty to act on Plaintiff's

application for adjustment of status within a reasonable period of time.

## III. JURISDICTION

     15.    This Honorable Court has subject matter jurisdiction over this

Application for Preliminary Injunction under F.R.C.P. 65 and L.Cv.R. 65.1(c) and

under the Constitution and laws of the United States, including the Fifth Amendment

to the U.S. Constitution, provisions of Title 8 U.S.C. §1101 (INA), 8 U.S.C. §1571

("The Immigration Services and Infrastructure Improvements Act of 2000"), 28

U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §2201 (Declaratory Judgment

Act), 28 U.S.C. §1361 (Mandamus Act), 28 U.S.C. §1651 (All Writs Act) as well as

under 5 U.S.C. §555 and 701, et seq. (APA). Relief is requested pursuant to these

rules of civil procedure, the U.S. Constitution and these statutes.

     16.    This Application is filed in response to unreasonable agency delay

and failure to complete Plaintiff's FBI NNCP screening and issue a "FBIQUERY

System" response to the USCIS, which has unreasonably prevented the adjudication

of Plaintiff's adjustment of status application, in violation of the APA.  While the FBI

delays in his case continue, Plaintiff's immigrant visa number (available in December

2007) will be assigned to another immigrant visa applicant on or after January 1,

2008.  Exhibits B and C

17.    There are no administrative remedies available to Plaintiff to redress

his grievances and irreparable injuries described herein.  As described more fully

below, Plaintiff has contacted U.S. Senator John Cornyn, the USCIS' Vermont

Service Center, made an official inquiry with the USCIS Ombudsman and through

U.S. Congressman Lloyd Doggett's office.  Exhibit D

18.    Plaintiff's instant action only seeks to enjoin the DOS from assigning

the immigrant visa number, available to him at the time of this filing, to another

immigrant visa applicant.

19.    Another U.S. District Court, in a similar case, **granted plaintiffs'**

**request for a preliminary injunction and suit for mandamus relief**, where the

plaintiffs' I-485 adjustment applications had been unreasonably delayed by FBI

background security checks.  See, Tang v. Chertoff, 2007 U.S. Dist. LEXIS 64022 at

*2-3, 14-19 (E.D. Ky. Aug, 29, 2007)

20.    This Court, in an opinion by U.S. District Judge Emmet G. Sullivan,

has specifically held that it has subject matter jurisdiction to hear a cause of action

similar to Plaintiff's Complaint for Writ of Mandamus, filed by an alien whose

adjustment application had been pending since July 23, 2003.  See, Liu v. Novak,

509 F.Supp. 2d 1, 13 (D.D.C. Aug. 30, 2007)

21.    As noted in Judge Sullivan's opinion, there is significant district court

authority holding that subject matter jurisdiction is appropriate for judicial review of

an **agency's failure to take action** or to review the pace of adjustment application

processing. Id., at 11-12.  *See also*, <u>Tang</u>, 2007 U.S. Dist. LEXIS 64022 at *14-19

(E.D. Ky. Aug, 29, 2007) (**granting a preliminary injunction and writ of**

**mandamus** after finding that USCIS had a non-discretionary duty to process

plaintiff's I-485 applications); <u>Xu v. Chertoff</u>, 2007 U.S. Dist. LEXIS 55215 at *2 (E.D.

Mich. July 31, 2007) (duty to process I-485 applications within a reasonable time is a

**non-discretionary duty** imposed by the APA and reviewable through the

mandamus statute); <u>Yan Yang v. Gonzales</u>, 2007 U.S. Dist. LEXIS 42143 at *6 (S.D.

Oh. June 11, 2007) (a complaint invoking the court's **mandamus jurisdiction** to

compel resolution of I-485 application was appropriate); <u>Song v. Klapakas</u>, 2007

U.S. Dist. LEXIS 27203 at *10 (E.D. Pa. April 12, 2007) (**mandamus jurisdiction** is

appropriate because defendants owe plaintiffs a **non-discretionary duty** to act on

their adjustment of status applications in a reasonable time); <u>Saleem v. Keisler</u>, 2007

U.S. Dist. LEXIS 80044 at *37 (W.D. Wisc. Oct. 26, 2007) (USCIS ordered to

adjudicate adjustment application within 60 days); <u>Jin v. Heinauer</u>, 2007 U.S. Dist.

LEXIS 89214 at *12-13 (S.D. Ohio Dec. 4, 2007) (USCIS ordered to adjudicate

adjustment application within 90 days); <u>Gershenzon v. Gonzales</u>, 2007 U.S. Dist.

LEXIS 68600 (W.D. Pa. Sept. 17, 2007) (motion to dismiss denied where USCIS had

not adjudicated an adjustment application for more than three years due to an

incomplete FBI NNCP screening); <u>Liu v. Chertoff</u>, 2007 U.S. Dist. LEXIS 50173 (E.D.

Cal. July 11, 2007) (two-and-a-half year delay); <u>Okunev v. Chertoff</u>, 2007 U.S. Dist.

LEXIS 53161 (N.D. Cal. July 11, 2007) (more than a three year delay); <u>Quan v.

Chertoff</u>, 2007 U.S. Dist. LEXIS 44081 (N.D. Cal. June 7, 2007) (unreasonable

delay); <u>Singh v. Still</u>, 470 F.Supp. 2d 1064, 1072  (N.D. Cal. 2007) (nearly a four

year delay); <u>Aboushaban v. Mueller</u>, 2006 U.S. Dist. LEXIS 81076 (N.D. Cal. 2006)

(an approximate eight year delay); <u>Salehian v. Novak</u>, 2006 U.S. Dist. LEXIS 77028

(D. Conn. 2006) (two year delay); <u>Duan v. Zamberry</u>, 2007 U.S. Dist. LEXIS 12697

(W.D. Pa. Feb. 23, 2007) (more than a one year delay); and <u>Jones v. Gonzales</u>,

2007 U.S. Dist. LEXIS 45012 (S.D. Fla. June 21, 2007) (delays of two and three

years).

**IV.  VENUE**

22.    Venue is properly with this Court, pursuant to 28 U.S.C. § 1391(e)(1)

because:

a.    Defendant Condoleezza Rice is the Secretary of the

Department of State, which is headquartered in the District of Columbia.  Defendant

Rice performs a significant amount of her official duties in the District of Columbia[2]

and resides, for purposes of venue, within the District of Columbia;

b.    Defendant Attorney General Michael B. Mukasey is an officer

of the Department of Justice and is responsible for the operation of the FBI, which is

headquartered in the District of Columbia.  Defendant Mukasey performs a

significant amount of his official duties in the District of Columbia and resides, for

purposes of venue, within the District of Columbia;

c.    Defendant Emilio Gonzalez is an officer of the Department of

Homeland Security and is the Director of the USCIS, which is headquartered in the

District of Columbia.  Defendant Gonzalez performs a significant amount of his

official duties in the District of Columbia and resides, for purposes of venue, within

the District of Columbia;

d.    Defendant Robert S. Mueller, III is an officer of the Department

of Justice and is Director of the FBI, which is headquartered in the District of

---

[2] It is well-established precedent in this Court that, "When an officer or agency head
performs a 'significant amount' of his or her official duties in the District of Columbia,
the District of Columbia is a proper place for venue."  <u>Jyachosky v. Winter</u>, 2006 U.S.
Dist. LEXIS 44399 at 12, hn. 6 (D.D.C. June 29, 2006), citing to <u>Bartman v. Cheney</u>,
827 F.Supp. 1, 1 (D.D.C. 1993) (holding that the Secretary of Defense resides in
Washington, D.C. for purposes of 28 U.S.C. § 1391(e))

Columbia.  Defendant Mueller performs a significant amount of his official duties in the District of Columbia and resides, for purposes of venue, within the District of Columbia;

        e.     Defendants Novak and Upchurch are officers of the Department of Homeland Security who retain jurisdiction over Plaintiff's adjustment application, subject to the discretion of Defendant Gonzalez, who resides in the District of Columbia.  This is demonstrated by the unexplained transfer of Plaintiff's adjustment application from the VSC to the TSC for processing;

        f.     A substantial part of the events or omissions giving rise to Plaintiff's Complaint occurred within the offices of the DOS, FBI, DHS and USCIS, which are all headquartered in the District of Columbia; and

        g.     Judicial economy and the interests of justice warrant that Plaintiff's action be brought and decided in the District of Columbia, because the above-listed Defendant U.S. officials perform a significant amount of their official duties, and their agencies are all located, within the jurisdiction of this Honorable Court, or are subject to the discretion of their Agency Director who is similarly located within the District of Columbia.

23.     Due to the decentralized nature of USCIS case processing, which allows for the transfer of adjustment applications to any USCIS facility located anywhere in the United States of America, at any time, venue is only appropriate in the District Court for the District of Columbia.

## V.  STATEMENT OF FACTS
### A.  Eligibility for Adjustment of Status

24.     On October 7, 2004, Plaintiff filed with the VSC an Application for Adjustment of Status pursuant to § 245 of the INA, 8 U.S.C. § 1255, to obtain lawful permanent resident status. Exhibit D

25.     The USCIS adjudication procedure involves the applicant's

submission of an Application for Adjustment of Status. Plaintiff's adjustment

application was properly filed with the VSC but was subsequently, and without

warning, transferred to the TSC.  It is the duty of the USCIS, regardless of how often

and to where it chooses to transfer Plaintiff's application within its myriad offices, to

timely adjudicate his application. Exhibit D

26.    Plaintiff has complied with all requests made by the USCIS to

complete all of the necessary biometrics appointments required by the USCIS. He

has provided all of the information requested by the agency and has complied with

all of the appointment notices. Exhibits A and D

**B. Exhaustion of Administrative Remedies**

27.    Plaintiff, by himself and through legal counsel, has made repeated

inquiries regarding the status of his Application for Adjustment of Status. Plaintiff was

advised in writing on several occasions that that the adjudication of his adjustment

application has been delayed because of the absence of the required security

checks and remained delayed for lack of the security checks. Exhibit D

28.    Plaintiff contacted the USCIS National Customer Service line

approximately every sixty (60) days since December 2004 (approximately twelve [12]

times total), but was informed that his adjustment application was being delayed due

to security checks. Exhibit D

29.    Plaintiff contacted the office of the Citizenship and Immigration

Services Ombudsman (CIS Ombudsman), in writing, on January 19, 2007, but did

not receive a written response from the USCIS until July 6, 2007, noting that his

adjustment application was being delayed due to incomplete security checks.

Exhibit D

30.    Plaintiff contacted the USCIS National Customer Service Center on

January 10, 2006 to update his address and was advised that his case has been

delayed because of a pending background investigation.  Exhibit D

31.     Plaintiff contacted the Congressman Lloyd Doggett, in writing, but received a written response on April 26, 2007 noting that his adjustment application was transferred to the Texas Service Center and that his fingerprints had expired and that a new fingerprint appointment was needed.  Exhibit D

32.     Plaintiff contacted Senator John Cornyn, in writing, on February 10, 2006, but was later informed that his adjustment application was being delayed due to incomplete security checks.  Exhibit D

33.     It is the stated goal of the USCIS to complete all adjustment applications within six months of their initial filing.   Further, the Vermont Service Center has indicated that they are processing applications of this type that were filed before July 24, 2006.  *See*, VSC Processing Dates – Posted November 14, 2007, a copy of which is attached and incorporated hereto as "Exhibit E."   The Texas Service Center has indicated that they are processing applications of this type within six (6) months.  *See*, TSC Processing Dates – Posted November 14, 2007, a copy of which is attached and incorporated hereto as "Exhibit F."

34.     As part of the adjustment of status process, the USCIS and FBI conduct several security-related background checks.  *See*, Declaration of Bradley J. Brouillette, dated April 23, 2007, which references a USCIS Fact Sheet dated April 25, 2006, which are attached and incorporated hereto as "Exhibit G."

35.     The FBI processes USCIS requested NNCP checks chronologically, based on the date the request was forwarded.  Initial responses to the NNCP check are generally available within two (2) weeks.  In eighty percent (80%) of applications, no "match" or derogatory information is found.  Of the remaining twenty percent (20%), most NNCP checks are resolved within six (6) months.  *See*, Exhibit G at page 6 and USCIS Fact Sheet, dated April 25, 2006, which was referenced in and incorporated into Mr. Brouillette's Declaration, at pages 2-3.

36.     Less that **one percent (1%) of cases** subject to an FBI NNCP check

**remain pending longer than six (6) months**.  Exhibit G, CIS Fact Sheet, page 2.

37.    The FBI has stated, in a declaration previously submitted to this

Court, that it has historically resolved approximately sixty-eight percent (68%) of

NNCP name checks with a "no record" result within **seventy-two (72) hours**.  Of the

remaining cases, a secondary check historically has revealed a "no record" result

within an additional **thirty to sixty (30-60) days** for twenty-two percent of all cases.

Of the remaining ten percent of cases, less than **one percent (1%)** of USCIS cases

are identified with a file containing *possible* derogatory information.  *See*, Declaration

of Michael A. Cannon, dated April 13, 2007 at pages 5-6, a copy of which is attached

and incorporated hereto as "Exhibit H."

## VI.  INJURIES TO PLAINTIFF

38.    Plaintiff will suffer irreparable injury in that the two (2) year delay in

the processing of his adjustment application will be further **delayed for an unknown**

**period of time** until the FBI completes its NNCP check clearance and until the DOS'

Visa Bulletin shows a processing date that allows for the adjudication of Plaintiff's

case.  There is no way to predict how long this will take, further compounding the

irreparable injuries to Plaintiff.

39.    Due to the agency inaction described above, Plaintiff's future

naturalization (to become a U.S. Citizen) has been delayed.  This further compounds

Plaintiff's irreparable injuries by disenfranchising him from participation in the U.S.

political process **for an unknown period of time.**

## VII.  GROUNDS FOR RELIEF

40.    Plaintiff seeks this preliminary injunction pursuant to Federal Rule of

Civil Procedure 65(a) and Local Rules of Civil Procedure 65.1(c) and 78.1 (request

for oral hearing on this application for a preliminary injunction).

41.    In determining whether to grant a request for a preliminary injunction,

a court must consider and balance four factors: (1) the likelihood of success on the

merits; (2) the likelihood of irreparable injury without the injunction; (3) the likelihood of substantial harm to others if the injunction is issued; and (4) the likelihood that the public interest will be served if the injunction is issued. *See*, <u>Tang</u>, 2007 U.S. Dist. LEXIS 64022 at *9-10.

42.    Plaintiff's adjustment application would be approvable at this time under the DOS' December 2007 Visa Bulletin and could be processed by the USCIS, but for the delay in the FBI completing its NNCP check clearance.

43.    The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(I).

44.    Mandamus is a remedy available for extreme agency delay where the agency has not performed a mandatory action. 28 U.S.C. §1361. *See also*, <u>Tang</u>, 2007 U.S. Dist. LEXIS 64022 at *14-19 (E.D. Ky. Aug, 29, 2007)

45.    Defendants' inaction is unconstitutional, violates the INA, is arbitrary and capricious and Plaintiff seeks a declaration to that effect under the Declaratory Judgment Act at 28 U.S.C. §2201.

46.    Based on the facts as stated above, and upon this Court's prior precedent in <u>Liu v. Novak</u>, 509 F.Supp. 2d 1, 13, there is a **very strong likelihood** that Plaintiff will prevail on the merits of his claims.

47.    There is a **substantial likelihood that Plaintiff will suffer irreparable and immeasurable harm** as there is no way to estimate how long his I-485 adjustment application will be further delayed (beyond the two (2) year delay that he has already suffered).

48.    Based on the facts stated above, and the existing processes at the DOS and FBI, there is very little likelihood of harm to others should this preliminary injunction be granted.

49.    Based on the facts stated above, and the USCIS and FBI's statements about the need to complete background checks for all adjustment of

status applicants, there is a very strong likelihood that the public interest will be served by the grant of Plaintiff's requested preliminary injunction.

50.    If Plaintiff prevails under any of his claims stated herein, he is entitled to recover his attorneys' fees and costs under the EAJA, as amended, 5 U.S.C. §504 and 28 U.S.C. §2412.

## VIII.  CLAIMS FOR RELIEF

51.    Defendants have unreasonably delayed and failed to perform a mandatory action in completing his NNCP screen and transmitting a "FBIQUERY System" response to the USCIS, thereby preventing the adjudication of Plaintiff's adjustment application that was filed over two (2) years ago and depriving Plaintiff of his right to lawful permanent residence status and benefits conferred there from including the accrual of time to apply for U.S. citizenship.

52.    Defendants owe Plaintiff the duty to act complete his NNCP screen and transmit a "FBIQUERY System" response and have unreasonably failed to perform these duties.

53.    Plaintiff has exhausted any administrative remedies that may exist. No other remedy exists to resolve the Defendants' inaction and to prevent the DOS from depleting all available EB-1 immigrant visa numbers for Pakistani nationals.

54.    Plaintiff has met the four requirements for the issuance of a preliminary injunction, having demonstrated (1) a very high likelihood for success on the merits of his Complaint for Writ of Mandamus, (2) a substantial likelihood that Plaintiff will suffer irreparable and immeasurable harm should the injunction not be granted, (3) that there is very little likelihood of harm to others should this preliminary injunction be granted and (4) a very strong likelihood that the public interest will be served by the grant of Plaintiff's requested preliminary injunction.

WHEREFORE, Plaintiff prays that this Honorable Court:

(1)   Enjoin the U.S. Department of State from releasing at least one (1) immigrant visa number for the EB-1 category for nationals from Pakistan and order that this immigrant visa number be reserved for Plaintiff's adjustment application;

(2)   Enjoin the U.S. Federal Bureau of Investigation from processing Plaintiff's NNCP check through its normal procedures and ordering the FBI to complete Plaintiff's NNCP check as expeditiously as possible;

(3)   Convert this Application for Preliminary Injunction, if necessary, into a Motion for Expedited Summary Judgment and set same for a hearing on or before December 31, 2007 and order Defendants to respond to this converted Motion within five (5) days from service of the instant Application;

(4)   Grant such other and further declaratory, injunctive or equitable relief as this Court deems proper under the circumstances; and

(5)   Grant attorney's fees, expenses and costs of court pursuant to the EAJA.

Aron A. Finkelstein, Esquire
DC Bar No. MD25590
Murthy Law Firm
10451 Mill Run Circle
Suite 100
Owings Mills, MD 21117
(410) 356-5440

Attorney for Plaintiff

# Exhibit A

State of Texas      )

County of Travis     )    SSN: 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
                   )

### AFFIDAVIT

I, Oam Parkash, after being duly sworn, do hereby state and affirm that:

1. I am a citizen and national of Pakistan, aged 34 years, and am competent to testify to the facts herein.

2. I reside at 2901 Gem Circle, Austin, TX 78704.

3. My date of birth is January 5, 1973 and I was born at Kantio, Pakistan.

4. I filed my Form I-485 Application for Adjustment of Status pursuant to §245 of the Immigration and Nationality Act ("INA"), 8 U.S.C. §1255, on October 7, 2004.

5. My Form I-485 Application for Adjustment has been pending since October 7, 2004 and I have completed all steps and complied with all U.S. Citizenship and Immigration Service ("USCIS") requests regarding my case.

6. I have been informed by multiple government sources that my I-485 Application is being delayed because of an unreasonable agency delay in that the Federal Bureau of Investigations ("FBI") has not completed my National Name Check Program clearance and generated a "FBIQUERY System" response, which is required before the USCIS may approve my Adjustment of Status.

7. I have made numerous requests regarding the status of my delayed I-485 Application including:

   a. Contacting U.S. Senator John Cornyn;

   b. Contacting the USCIS' Vermont Service Center;

   c. Making an official inquiry with the USCIS Ombudsman and;

   d. Making an official inquiry through U.S. Congressman Lloyd Doggett's office.

8. Despite these repeated attempts, and a delay of over three (3) year, my I-485 Application has not been processed due to the FBI NNCP processing delay.

9. Pursuant to the December 2007 Visa Bulletin, issued by the U.S. Department of State, the priority date for processing for EB-2 immigrant visas for Pakistani nationals is current. My priority date for my EB-2 visa is October 7, 2004, which means that my case could be approved at this time, if my FBI NNCP check was completed.

10. Pursuant to the recently released January 2008 Visa Bulletin, the new processing cut-off

for EB-2 immigrant visas for Pakistani nationals is current. Based on prior 2007 Visa Bulletins and my priority date, there is no guarantee that an immigrant visa number will be available to me after January 1, 2008. Consequently, even if my I-485 Application could be approved, at this time, issue of my permanent resident card may be further delayed for an unknown period of time.

11. The FBI's unreasonable delay in completing my NNCP check is preventing me from having my I-485 Application adjudicated and is preventing me from becoming a lawful permanent resident and eventually, a U.S. citizen.

I AFFIRM under penalty of perjury and upon personal knowledge that the above statements and facts are true and accurate to the best of my knowledge, information and belief.

Signature: 

Oam Parkash

Date: 12·17·07

STATE OF TEXAS_____, CITY/COUNTY OF TRAVIS_____, TO WIT:

I HEREBY CERTIFY THAT on this 17TH day of DECEMBER, 2007, before me, a Notary Public of the aforesaid State and City/County, personally appeared OAM PARKASH, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument, who acknowledged that s/he has executed it for the purposes therein set forth.

FRANCISCA C. WOODWARD
Notary Public, State of Texas
My Comm. Expires 09-17-2011

NOTARY PUBLIC

# Exhibit B


# Visa Bulletin

*Number 113*
*Volume VIII*
*Washington, D.C.*

## VISA BULLETIN FOR DECEMBER 2007

### A. STATUTORY NUMBERS

1.  This bulletin summarizes the availability of immigrant numbers during **December**. Consular officers are required to report to the Department of State documentarily qualified applicants for numerically limited visas; the Bureau of Citizenship and Immigration Services in the Department of Homeland Security reports applicants for adjustment of status. Allocations were made, to the extent possible under the numerical limitations, for the demand received by November **13th** in the chronological order of the reported priority dates. If the demand could not be satisfied within the statutory or regulatory limits, the category or foreign state in which demand was excessive was deemed oversubscribed. The cut-off date for an oversubscribed category is the priority date of the first applicant who could not be reached within the numerical limits. Only applicants who have a priority date **earlier than** the cut-off date may be allotted a number. Immediately that it becomes necessary during the monthly allocation process to retrogress a cut-off date, supplemental requests for numbers will be honored only if the priority date falls within the new cut-off date.

2.  Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference limit of 226,000. The worldwide level for annual employment-based preference immigrants is at least 140,000. Section 202 prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620. The dependent area limit is set at 2%, or 7,320.

3.  Section 203 of the INA prescribes preference classes for allotment of immigrant visas as follows:

### FAMILY-SPONSORED PREFERENCES

**First:** Unmarried Sons and Daughters of Citizens: 23,400 plus any numbers not required for fourth preference.

**Second:** Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents: 114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, and any unused first preference numbers:

A. Spouses and Children: 77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. Unmarried Sons and Daughters (21 years of age or older): 23% of the overall second preference limitation.

**Third:** Married Sons and Daughters of Citizens: 23,400, plus any numbers not required by first and second preferences.

**Fourth:** Brothers and Sisters of Adult Citizens: 65,000, plus any numbers not required by first three preferences.

### EMPLOYMENT-BASED PREFERENCES

**First:** Priority Workers: 28.6% of the worldwide employment-based preference level, plus any numbers not required for fourth and fifth preferences.

**Second:** Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability: 28.6% of the worldwide employment-based preference level, plus any numbers not required by first

preference.

**Third:** Skilled Workers, Professionals, and Other Workers: 28.6% of the worldwide level, plus any numbers not required by first and second preferences, not more than 10,000 of which to "Other Workers".

**Fourth:** Certain Special Immigrants: 7.1% of the worldwide level.

**Fifth:** Employment Creation: 7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of P.L. 102-395.

4. INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligible immigrants in the order in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of preference immigrants are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal. The visa prorating provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceeds the per-country limit. These provisions apply at present to the following oversubscribed chargeability areas: CHINA-mainland born, INDIA, MEXICO, and PHILIPPINES.

5. On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available. (NOTE: Numbers are available only for applicants whose priority date is **earlier** than the cut-off date listed below.)

| Fam-ily | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPP-INES |
|---------|------------------|------------------|--------|--------|------------|
| 1st | 08JAN02 | 08JAN02 | 08JAN02 | 01JUL92 | 22SEP92 |
| 2A | 15JAN03 | 15JAN03 | 15JAN03 | 01MAY02 | 15JAN03 |
| 2B | 15OCT98 | 15OCT98 | 15OCT98 | 15MAR92 | 01JAN97 |
| 3rd | 08APR00 | 08APR00 | 08APR00 | 08JUL92 | 01APR91 |
| 4th | 22JUN97 | 08OCT96 | 15AUG96 | 22SEP94 | 08NOV85 |

**\*NOTE:** For December, 2A numbers **EXEMPT from per-country limit** are available to applicants from all countries with priority dates **earlier** than 01MAY02. 2A numbers **SUBJECT to per-country limit** are available to applicants chargeable to all countries **EXCEPT MEXICO** with priority dates beginning 01MAY02 and earlier than 15JAN03. (All 2A numbers provided for MEXICO are exempt from the per-country limit; there are no 2A numbers for MEXICO subject to per-country limit.)

| | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIP-PINES |
|---|------------------|------------------|--------|--------|------------|
| **Employ-ment-Based** | | | | | |
| 1st | C | C | C | C | C |
| 2nd | C | 01JAN03 | 01JAN02 | C | C |
| 3rd | 01SEP02 | 15OCT01 | 01MAY01 | 22APR01 | 01SEP02 |

| Other Workers | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 |
|---|---|---|---|---|---|
| 4th | C | C | C | C | C |
| Certain Religious Workers | C | C | C | C | C |
| 5th | C | C | C | C | C |
| Targeted Employment Areas/ Regional Centers | C | C | C | C | C |

The Department of State has available a recorded message with visa availability information which can be heard at: (area code 202) 663-1541. This recording will be updated in the middle of each month with information on cut-off dates for the following month.

Employment Third Preference Other Workers Category: Section 203(e) of the NACARA, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002.

## B. DIVERSITY IMMIGRANT (DV) CATEGORY

Section 203(c) of the Immigration and Nationality Act provides a maximum of up to 55,000 immigrant visas each fiscal year to permit immigration opportunities for persons from countries other than the principal sources of current immigration to the United States. The Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulates that beginning with DV-99, and for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for use under the NACARA program. **This reduction has resulted in the DV-2008 annual limit being reduced to 50,000.** DV visas are divided among six geographic regions. No one country can receive more than seven percent of the available diversity visas in any one year.

For **December**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 11,100 | Except: Egypt: 8,400 Ethiopia: 6,950 Nigeria: 6,900 |
| ASIA | 4,750 | |
| EUROPE | 11,100 | |
| NORTH | | |

| | | |
|---|---|---|
| AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 675 | |
| SOUTH AMERICA, and the CARIBBEAN | 900 | |

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which the applicant is selected in the lottery. The year of entitlement for all applicants registered for the DV-2008 program ends as of September 30, 2008. DV visas may not be issued to DV-2008 applicants after that date. Similarly, spouses and children accompanying or following to join DV-2008 principals are only entitled to derivative DV status until September 30, 2008. DV visa availability through the very end of FY-2008 cannot be taken for granted. Numbers could be exhausted prior to September 30.

## C. ADVANCE NOTIFICATION OF THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH WILL APPLY IN JANUARY

For **January**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 13,100 | Except: Egypt: 11,000 Ethiopia: 8,600 Nigeria: 7,200 |
| ASIA | 6,100 | |
| EUROPE | 13,600 | |
| NORTH AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 775 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,075 | |

## D. CHINA-MAINLAND BORN AND INDIA EMPLOYMENT SECOND PREFERENCE CUT-OFF DATES RETROGRESS FOR DECEMBER

It has been necessary to retrogress both the China-mainland born and India Employment Second preference cut-off dates. This is a direct result of extraordinarily heavy applicant demand for numbers, primarily by Citizenship and Immigration Services offices for adjustment of status cases. Additional retrogressions cannot be ruled out during the second quarter of the fiscal year.

## E. IMMIGRANT VISA AVAILABILITY DURING THE COMING MONTHS

The following projections are based on the demand patterns which are currently being experienced. Fluctuations in demand could alter such projections at any time. Therefore, they should only be used as a guideline of what might occur. Under no circumstances should they be used as a basis for making any formal plans prior to the announcement of the monthly cut-off dates.

**Family Preferences - Worldwide:** Movement consistent with that of recent months can be expected for the foreseeable future.

**Employment Preferences - Worldwide and Philippines:**

First:   Will remain "Current"

Second:   Will remain "Current"

Third:   Slow forward movement should be possible while demand patterns are established.

Third "Other Workers" (All Countries):  Little if any forward movement is expected at this time.  Should the current demand pattern continue, it may be necessary to retrogress the cut-off date at some point later in the fiscal year.

**CHINA-mainland born and INDIA:**

Employment Preferences:

First:  Continued heavy demand may require the establishment of a cut-off date at some point during the fiscal year.

Second:  Demand during October and the first week of November has already used over 38 percent of the annual limit.  It is hoped that the December retrogressions will return monthly number use within the target range.  If not, further retrogressions cannot be ruled out.

### F. OBTAINING THE MONTHLY VISA BULLETIN

The Department of State's Bureau of Consular Affairs offers the monthly "Visa Bulletin" on the INTERNET'S WORLDWIDE WEB.  The INTERNET Web address to access the Bulletin is**:**

**http://travel.state.gov**

From the home page, select the VISA section which contains the Visa Bulletin.

To be **placed on** the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type:
**Subscribe Visa-Bulletin** *First name/Last name*
*(example:  Subscribe Visa-Bulletin  Sally Doe)*

To be **removed from** the Department of State's E-mail subscription list for the  "Visa Bulletin", send an e-mail message to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type: **Signoff Visa-Bulletin**

The Department of State also has available a recorded message with visa cut-off dates which can be heard at: (area code 202) 663-1541.  The recording is normally updated by the middle of each month with information on cut-off dates for the following month.

Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

**VISABULLETIN@STATE.GOV**


(This address cannot be used to subscribe to the Visa Bulletin.)

Department of State Publication 9514
CA/VO:November 13, 2007

# Exhibit C

# Visa Bulletin

Number 114
Volume VIII
Washington, D.C.

## VISA BULLETIN FOR JANUARY 2008

### A. STATUTORY NUMBERS

1. This bulletin summarizes the availability of immigrant numbers during **January**. Consular officers are required to report to the Department of State documentarily qualified applicants for numerically limited visas; the Bureau of Citizenship and Immigration Services in the Department of Homeland Security reports applicants for adjustment of status. Allocations were made, to the extent possible under the numerical limitations, for the demand received by December **10th** in the chronological order of the reported priority dates. If the demand could not be satisfied within the statutory or regulatory limits, the category or foreign state in which demand was excessive was deemed oversubscribed. The cut-off date for an oversubscribed category is the priority date of the first applicant who could not be reached within the numerical limits. Only applicants who have a priority date **earlier than** the cut-off date may be allotted a number. Immediately that it becomes necessary during the monthly allocation process to retrogress a cut-off date, supplemental requests for numbers will be honored only if the priority date falls within the new cut-off date.

2. Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference limit of 226,000. The worldwide level for annual employment-based preference immigrants is at least 140,000. Section 202 prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620. The dependent area limit is set at 2%, or 7,320.

3. Section 203 of the INA prescribes preference classes for allotment of immigrant visas as follows:

### FAMILY-SPONSORED PREFERENCES

**First:** Unmarried Sons and Daughters of Citizens: 23,400 plus any numbers not required for fourth preference.

**Second:** Spouses and Children, and Unmarried Sons and Daughters of Permanent

Residents: 114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, and any unused first preference numbers:

A. Spouses and Children: 77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. Unmarried Sons and Daughters (21 years of age or older): 23% of the overall second preference limitation.

**Third:** Married Sons and Daughters of Citizens: 23,400, plus any numbers not required by first and second preferences.

**Fourth:** Brothers and Sisters of Adult Citizens: 65,000, plus any numbers not required by first three preferences.

### EMPLOYMENT-BASED PREFERENCES

**First:** Priority Workers: 28.6% of the worldwide employment-based preference level, plus any numbers not required for fourth and fifth preferences.

**Second:** Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability:

28.6% of the worldwide employment-based preference level, plus any numbers not required by first preference.

**Third:** Skilled Workers, Professionals, and Other Workers: 28.6% of the worldwide level, plus any numbers not required by first and second preferences, not more than 10,000 of which to "Other Workers".

**Fourth:** Certain Special Immigrants: 7.1% of the worldwide level.

**Fifth:** Employment Creation: 7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of P.L. 102-395.

4. INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligible immigrants in the order in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of preference immigrants are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal. The visa prorating provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceeds the per-country limit. These provisions apply at present to the following oversubscribed chargeability areas: CHINA-mainland born, INDIA, MEXICO, and PHILIPPINES.

5. On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available. (NOTE: Numbers are available only for applicants whose priority date is **earlier** than the cut-off date listed below.)

| Fam-ily | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPP-INES |
|---|---|---|---|---|---|
| 1st | 01FEB02 | 01FEB02 | 01FEB02 | 01JUL92 | 22NOV92 |
| 2A | 22FEB03 | 22FEB03 | 22FEB03 | 01MAY02 | 22FEB03 |
| 2B | 22NOV98 | 22NOV98 | 22NOV98 | 22MAR92 | 15JAN97 |
| 3rd | 08MAY00 | 08MAY00 | 08MAY00 | 08JUL92 | 01APR91 |
| 4th | 08JUL97 | 01NOV96 | 15SEP96 | 01OCT94 | 01FEB86 |

**\*NOTE:** For January, 2A numbers **EXEMPT from per-country limit** are available to applicants from all countries with priority dates **earlier** than 01MAY02. 2A numbers **SUBJECT to per-country limit** are available to applicants chargeable to all countries **EXCEPT MEXICO** with priority dates beginning 01MAY02 and earlier than 22FEB03. (All 2A numbers provided for MEXICO are exempt from the per-country limit; there are no 2A numbers for MEXICO subject to per-country limit.)

| | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIP-PINES |
|---|---|---|---|---|---|
| Employ-ment-Based | | | | | |
| 1st | C | C | C | C | C |
| 2nd | C | 01JAN03 | 01JAN00 | C | C |
| 3rd | 15OCT02 | 01NOV01 | 01MAY01 | 22APR01 | 15OCT02 |

| Other Workers | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 |
|---|---|---|---|---|---|
| 4th | C | C | C | C | C |
| Certain Religious Workers | C | C | C | C | C |
| 5th | C | C | C | C | C |
| Targeted Employment Areas/ Regional Centers | C | C | C | C | C |

The Department of State has available a recorded message with visa availability information which can be heard at: (area code 202) 663-1541. This recording will be updated in the middle of each month with information on cut-off dates for the following month.

Employment Third Preference Other Workers Category: Section 203(e) of the NACARA, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002.

## B. DIVERSITY IMMIGRANT (DV) CATEGORY

Section 203(c) of the Immigration and Nationality Act provides a maximum of up to 55,000 immigrant visas each fiscal year to permit immigration opportunities for persons from countries other than the principal sources of current immigration to the United States. The Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulates that beginning with DV-99, and for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for use under the NACARA program. **This reduction has resulted in the DV-2008 annual limit being reduced to 50,000.** DV visas are divided among six geographic regions. No one country can receive more than seven percent of the available diversity visas in any one year.

For **January**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 13,100 | Except: Egypt: 11,000 Ethiopia: 8,600 Nigeria: 7,200 |
| ASIA | 6,100 | |
| EUROPE | 13,600 | |
| NORTH | | |

| | | |
|---|---|---|
| AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 775 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,075 | |

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which the applicant is selected in the lottery. The year of entitlement for all applicants registered for the DV-2008 program ends as of September 30, 2008. DV visas may not be issued to DV-2008 applicants after that date. Similarly, spouses and children accompanying or following to join DV-2008 principals are only entitled to derivative DV status until September 30, 2008. DV visa availability through the very end of FY-2008 cannot be taken for granted. Numbers could be exhausted prior to September 30.

## C. ADVANCE NOTIFICATION OF THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH WILL APPLY IN FEBRUARY

For **February**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 16,200 | Except: Egypt: 13,300 Ethiopia: 10,200 Nigeria: 7,700 |
| ASIA | 6,900 | |
| EUROPE | 15,300 | |
| NORTH AMERICA (BAHAMAS) | 5 | |
| OCEANIA | 850 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,175 | |

## D. INDIA EMPLOYMENT SECOND PREFERENCE CUT-OFF DATE RETROGRESSION FOR JANUARY

It has been necessary to once again retrogress the India Employment Second preference cut-off date. This is a direct result of continued heavy applicant demand for numbers by CIS for adjustment of status cases despite the retrogression which occurred for December. It is likely that the annual limit for this category will be reached within the next few months, at which time the category would become "unavailable" for the remainder of fiscal year 2008.

## E. OBTAINING THE MONTHLY VISA BULLETIN

The Department of State's Bureau of Consular Affairs offers the monthly "Visa Bulletin" on the INTERNET'S WORLDWIDE WEB. The INTERNET Web address to access the Bulletin is:

http://travel.state.gov

From the home page, select the VISA section which contains the Visa Bulletin.

To be **placed on** the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type:
**Subscribe Visa-Bulletin** *First name/Last name*
*(example:  Subscribe Visa-Bulletin  Sally Doe)*

To be **removed from** the Department of State's E-mail subscription list for the  "Visa Bulletin", send an e-mail message to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type: **Signoff Visa-Bulletin**

The Department of State also has available a recorded message with visa cut-off dates which can be heard at: (area code 202) 663-1541. The recording is normally updated by the middle of each month with information on cut-off dates for the following month.

Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

**VISABULLETIN@STATE.GOV**

(This address cannot be used to subscribe to the Visa Bulletin.)

Department of State Publication 9514
CA/VO: December 10, 2007

# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OAM PARKASH,<br>2901 Gem Circle,<br>Austin, TX 78704 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) COMPLAINT FOR PETITION FOR<br>) WRIT OF MANDAMUS AND FOR |
| v. | ) DECLARATIVE AND INJUNCTIVE<br>) RELIEF |
| CONDOLEEZZA RICE, Secretary of<br>State of the United States, in her<br>official capacity as well as her<br>successors and assigns,<br>U.S. Department of State,<br>2201 C Street, N.W.,<br>Washington, D.C. 20501-0001, | )<br>) CIVIL ACTION NO.<br>)<br>) AGENCY CASE NO. A098-586-297<br>)<br>) REQUEST FOR ORAL ARGUMENT<br>) |
| and | )<br>) |
| MICHAEL B. MUKASEY, Attorney<br>General of the United States, in his<br>official capacity as well as his<br>successors and assigns,<br>U.S. Department of Justice,<br>950 Pennsylvania Avenue, N.W.,<br>Washington, D.C. 20530-0001, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| ROBERT S. MUELLER, III, Director,<br>Federal Bureau of Investigation,<br>In his official capacity, as well as his<br>successors and assigns,<br>J. Edgar Hoover Building,<br>935 Pennsylvania Avenue N.W.,<br>Washington, DC 20535-0001 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| EMILIO T. GONZALEZ, Director,<br>U.S. Department of Homeland<br>Security, U.S. Citizenship and<br>Immigration Services, in his official<br>capacity, as well as his successors<br>and assigns,<br>20 Massachusetts Avenue, N.W.,<br>Washington, DC 20529 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| and | )<br>)<br>)<br>)<br>) |

**PAUL E. NOVAK, JR., Director,**
**Vermont Service Center,**
**U.S. Department of Homeland**
**Security, U.S. Citizenship and**
**Immigration Services, in his official**
**capacity as well as his successors**
**and assigns,**
**75 Lower Welden Street,**
**St. Albans, VT 05479-0001**

      **and**

**EVELYN C. UPCHURCH, Director,**
**Texas Service Center, U.S.**
**Department of Homeland Security,**
**U.S. Citizenship and Immigration**
**Services, in her official capacity as**
**well as her successors and assigns,**
**4141 North St. Augustine Road,**
**Dallas, TX 75227,**

      **Defendants.**


## COMPLAINT FOR PETITION FOR WRIT OF MANDAMUS
## AND FOR DECLARATIVE AND INJUNCTIVE RELIEF


**To the Honorable Judges of Said Court:**

    COMES NOW, Plaintiff, Oam Parkash, through his undersigned counsel, and

alleges as follows:

### I. INTRODUCTION

    1.    This is a civil action seeking mandamus, declaratory and injunctive

relief based upon the failure of the Federal Bureau of Investigation ("FBI") to

complete Plaintiff's National Name Check Program clearance, which has

unreasonably delayed any adjudication of Plaintiff's application for adjustment of

status, which was filed by Plaintiff, pursuant to §245 of the Immigration and

Nationality Act, 8 U.S.C. §1255 ("INA"), on **October 7, 2004**. *See*, Affidavit of Oam

Parkash, dated December 17, 2007, a copy of which is attached and incorporated

hereto as "Exhibit A."

2.      Plaintiff seeks to compel Defendant Attorney General Mukasey, and those acting under his direction, to complete Plaintiff's FBI National Name Check Program clearance (generating a "FBIQUERY System" response), which is required before the U.S. Citizenship and Immigration Service ("USCIS") can adjudicate his application for adjustment of status pursuant to §245 of the INA, the Mandamus and Venue Act (28 U.S.C. §1361) ("Mandamus Act"), 8 U.S.C. §1101 (INA), 8 U.S.C. §1571 ("The Immigration Services and Infrastructure Improvements Act of 2000"), the Declaratory Judgment Act (28 U.S.C. §2201) and the Administrative Procedures Act (5 U.S.C. §551 and §701, et seq.) ("APA").

3.      Attorneys fees and costs are entitled to Plaintiff pursuant to the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412(d), et seq.[1]

## II. PARTIES

4.      Plaintiff, Oam Parkash, is an adult individual who is a national of Pakistan and resides lawfully in the United States. He resides at 2901 Gem Circle, Austin, TX 78704. Exhibit A.

5.      Dr. Condoleezza Rice is the U.S. Secretary of State and this action is brought against her in her official capacity only, as well as her successors and assigns. She is generally charged with implementing U.S. foreign policy and is further authorized to delegate such powers and authority to subordinate employees of the Bureau of Consular Affairs ("BCA"), which is an agency within the Department of State. The BCA is responsible for the issuance of visas to foreign nationals for entry into the U.S. and is also responsible for the tracking and allocation of visa numbers to foreign nationals. The BCA releases a monthly Visa Bulletin that indicates when a foreign national may apply for a class of immigrant visas based on

---

[1] See, <u>Elkhatib v. Bulger</u>, 2006 U.S. Dist. LEXIS 60485 (S.D. Fla. 2006) (fees granted after a plaintiff succeeded in his mandamus action seeking to compel the USCIS to adjudicate his adjustment application) and <u>Aboushaban v. Mueller</u>, 2007 U.S. Dist. LEXIS 15402 (N.D. Cal. 2006) (fees granted after the Court granted a plaintiff's writ of mandamus and ordered the USCIS to adjudicate his adjustment

his or her visa priority dates.  Only visa applicants with a priority date earlier than the cut-off date listed for each category in the Visa Bulletin may be assigned a visa number and granted an immigrant visa.  *See*, Visa Bulletin for January 2008 and Visa Bulletin for December 2007, copies of which are attached and incorporated hereto as "Exhibit B" and "Exhibit C."

6.    Michael B. Mukasey is the Attorney General of the United States and this action is brought against him in his official capacity only, as well as his successors and assigns.  He is generally charged with enforcement of the Immigration and Nationality Act, and is further authorized to delegate such powers and authority to subordinate employees of the FBI, which is an agency within the U.S. Department of Justice.  More specifically, Mr. Mukasey is responsible for overseeing the FBI's National Name Check Program ("NNCP"), which is mandated by Executive Order No. 10450.  Presently, every intending immigrant must complete an FBI NNCP screening before his or her adjustment of status application can be approved.  *See*, 22 C.F.R. §42.67(c)(2).

7.    Robert S. Mueller, III, is the Director of the FBI and is named herein only his official capacity, as well as his successors and assigns, and his duties include ensuring timely completion of all requests made by the USCIS for security clearances, including NNCP screenings. The FBI is headquartered at the J. Edgar Hoover Building, 935 Pennsylvania Avenue, NW, Washington, DC 20535-0001.

8.    Dr. Emilio Gonzalez is the Director of the USCIS, who is named herein only his official capacity, as well as his successors and assigns.  He is generally charged with the implementation of the Immigration and Nationality Act, and is further authorized to delegate such powers and authority to subordinate employees of the USCIS.  USCIS is specifically assigned the adjudication of immigrant visa petitions as well as applications for permanent residence status under §245 of the INA.  USCIS is headquartered at 20 Massachusetts Avenue, N.W.,

Washington, DC 20529.

9.    Defendants Rice, Mukasey, Gonzalez and Mueller are federal officers and agency heads who perform a significant amount of their official duties in the District of Columbia.

10.    Paul E. Novak, Jr. is the District Director of the Vermont Service Center ("VSC") of the USCIS and is named herein only in his official capacity, as well as his successors and assigns. Plaintiff properly filed his application for adjustment of status with the VSC and that office retained his application for several years before transferring his case to the Texas Service Center ("TSC"). USCIS, through its headquarters in Washington, D.C., any of its four (4) service centers, National Benefits Center, numerous Field Offices, numerous Sub-Offices and Application Support Centers, has a mandatory duty to act on Plaintiff's application for adjustment of status within a reasonable period of time.

11.    Evelyn C. Upchurch is the District Director of the TSC and is named herein only in her official capacity, as well as her successors and assigns. While Plaintiff properly filed his application for adjustment of status with the VSC, the USCIS unilaterally transferred Plaintiff's application to the TSC for processing. USCIS, through its headquarters in Washington, D.C., any of its four (4) service centers, National Benefits Center, numerous Field Offices, numerous Sub-Offices and Application Support Centers, has a mandatory duty to act on Plaintiff's application for adjustment of status within a reasonable period of time.

## III.  JURISDICTION

12.    This Honorable Court has subject matter jurisdiction over this Complaint under the Constitution and laws of the United States, including the Fifth Amendment to the U.S. Constitution, provisions of Title 8 U.S.C. §1101 (INA), 8 U.S.C. §1571 ("The Immigration Services and Infrastructure Improvements Act of 2000"), 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §2201 (Declaratory

Judgment Act), 28 U.S.C. §1361 (Mandamus Act), 28 U.S.C. §1651 (All Writs Act)

as well as under 5 U.S.C. §§555 and 701, et seq. (APA).  Relief is requested pursuant

to the U.S. Constitution and these statutes.

13.    When Congress enacted The Immigration Services and Infrastructure

Improvements Act of 2000, it set the period of one-hundred-and-eighty days (180) as

the normative expectation for the government to complete the processing of an

immigrant benefit application.  This 180 day period, which begins upon the initial

filing of the application, is considered a **reasonable processing time**.   See, 8

U.S.C. §1571 and Konchitsky v. Chertoff, 2007 U.S. Dist. LEXIS 53998 at 11-15

(N.D. Cal. July 13, 2007)

14.    **Plaintiff's adjustment application has therefore been for almost**

**three (3) years longer than what is considered reasonable** under 8 U.S.C.

§1571.

15.    This action is filed in response to the FBI's unreasonable agency

delay and failure to complete Plaintiff's FBI NNCP screening and issue a

"FBIQUERY System" response to the USCIS, which has unreasonably prevented the

adjudication of Plaintiff's adjustment of status application, in violation of the APA.

Plaintiff merely seeks to compel FBI action on an unreasonably delayed NNCP

screening.  **Plaintiff does not seek review of a discretionary decision rendered**

**or act by non-FBI Defendants, including any action on the part of Defendant**

**USCIS.**

16.    There are no administrative remedies available to Plaintiff to redress

his grievances described herein.  As described more fully below, Plaintiff has

contacted U.S. Senator John Cornyn, the USCIS' Vermont Service Center, made an

official inquiry with the USCIS Ombudsman and through U.S. Congressman Lloyd

Doggett's office.

17.     Plaintiff's instant action challenges only the reasonableness of Defendant FBI's delay or inaction in the completion of his NNCP screening and transmission of a "FBIQUERY System" response to the USCIS, not the grant or denial of his adjustment application, therefore the jurisdictional limitations of 8 U.S.C. §1252 do not apply.

18.     This Court, in an opinion by U.S. District Judge Emmet G. Sullivan, has specifically held that it has subject matter jurisdiction to hear a similar cause of action under the APA filed by an alien whose adjustment application had been pending since July 23, 2003.  *See*, Liu v. Novak, 509 F.Supp. 2d 1, 13 (D.D.C. Aug. 30, 2007)

19.     As noted in Judge Sullivan's opinion, there is significant district court authority holding that subject matter jurisdiction is appropriate for judicial review of an **agency's failure to take action** or to review the pace of adjustment application processing.  Id., at 11-12.  *See also*, Tang v. Chertoff, 2007 U.S. Dist. LEXIS 64022 at *14-19 (E.D. Ky. Aug, 29, 2007) (**granting a preliminary injunction and writ of mandamus** after finding that USCIS had a non-discretionary duty to process plaintiff's I-485 applications); Xu v. Chertoff, 2007 U.S. Dist. LEXIS 55215 at *2 (E.D. Mich. July 31, 2007) (duty to process I-485 applications within a reasonable time is a **non-discretionary duty** imposed by the APA and reviewable through the mandamus statute); Yan Yang v. Gonzales, 2007 U.S. Dist. LEXIS 42143 at *6 (S.D. Oh. June 11, 2007) (a complaint invoking the court's **mandamus jurisdiction** to compel resolution of I-485 application was appropriate); Song v. Klapakas, 2007 U.S. Dist. LEXIS 27203 at *10 (E.D. Pa. April 12, 2007) (**mandamus jurisdiction** is appropriate because defendants owe plaintiffs a **non-discretionary duty** to act on their adjustment of status applications in a reasonable time); Saleem v. Keisler, 2007 U.S. Dist. LEXIS 80044 at *37 (W.D. Wisc. Oct. 26, 2007) (USCIS ordered to

adjudicate adjustment application within 60 days); Jin v. Heinauer, 2007 U.S. Dist.

LEXIS 89214 at *12-13 (S.D. Ohio Dec. 4, 2007) (USCIS ordered to adjudicate

adjustment application within 90 days); Gershenzon v. Gonzales, 2007 U.S. Dist.

LEXIS 68600 (W.D. Pa. Sept. 17, 2007) (motion to dismiss denied where USCIS had

not adjudicated an adjustment application for more than three years due to an

incomplete FBI NNCP screening); Liu v. Chertoff, 2007 U.S. Dist. LEXIS 50173 (E.D.

Cal. July 11, 2007) (two-and-a-half year delay); Okunev v. Chertoff, 2007 U.S. Dist.

LEXIS 53161 (N.D. Cal. July 11, 2007) (more than a three year delay); Quan v.

Chertoff, 2007 U.S. Dist. LEXIS 44081 (N.D. Cal. June 7, 2007) (unreasonable

delay); Singh v. Still, 470 F.Supp. 2d 1064, 1072  (N.D. Cal. 2007) (nearly a four

year delay); Aboushaban v. Mueller, 2006 U.S. Dist. LEXIS 81076 (N.D. Cal. 2006)

(an approximate eight year delay); Salehian v. Novak, 2006 U.S. Dist. LEXIS 77028

(D. Conn. 2006) (two year delay); Duan v. Zamberry, 2007 U.S. Dist. LEXIS 12697

(W.D. Pa. Feb. 23, 2007) (more than a one year delay); and Jones v. Gonzales,

2007 U.S. Dist. LEXIS 45012 (S.D. Fla. June 21, 2007) (delays of two and three

years).

**IV.  VENUE**

20.     Venue is properly with this Court, pursuant to 28 U.S.C. § 1391(e)(1)

because:

a.     Defendant Condoleezza Rice is the Secretary of the

Department of State, which is headquartered in the District of Columbia.  Defendant

Rice performs a significant amount of her official duties in the District of Columbia[2]

and resides, for purposes of venue, within the District of Columbia;

---

[2] It is well-established precedent in this Court that, "When an officer or agency head
performs a 'significant amount' of his or her official duties in the District of Columbia,
the District of Columbia is a proper place for venue." Jyachosky v. Winter, 2006 U.S.
Dist. LEXIS 44399 at 12, hn. 6 (D.D.C. June 29, 2006), citing to Bartman v. Cheney,
827 F.Supp. 1, 1 (D.D.C. 1993) (holding that the Secretary of Defense resides in

b.    Defendant Attorney General Michael B. Mukasey is an officer of the Department of Justice and is responsible for the operation of the FBI, which is headquartered in the District of Columbia.  Defendant Mukasey performs a significant amount of his official duties in the District of Columbia and resides, for purposes of venue, within the District of Columbia;

c.    Defendant Emilio Gonzalez is an officer of the Department of Homeland Security and is the Director of the USCIS, which is headquartered in the District of Columbia.  Defendant Gonzalez performs a significant amount of his official duties in the District of Columbia and resides, for purposes of venue, within the District of Columbia;

d.    Defendant Robert S. Mueller, III is an officer of the Department of Justice and is Director of the FBI, which is headquartered in the District of Columbia.  Defendant Mueller performs a significant amount of his official duties in the District of Columbia and resides, for purposes of venue, within the District of Columbia;

e.    Defendants Novak and Upchurch are officers of the Department of Homeland Security who retain jurisdiction over Plaintiff's adjustment application, subject to the discretion of Defendant Gonzalez, who resides in the District of Columbia.  This is demonstrated by the unexplained transfer of Plaintiff's adjustment application from the VSC to the TSC for processing;

f.    A substantial part of the events or omissions giving rise to Plaintiff's Complaint occurred within the offices of the FBI, DHS and USCIS, which are all headquartered in the District of Columbia; and

g.    Judicial economy and the interests of justice warrant that Plaintiff's action be brought and decided in the District of Columbia, because the above-listed Defendant U.S. officials perform a significant amount of their official

duties, and their agencies are all located, within the jurisdiction of this Honorable

Court, or are subject to the discretion of their Agency Director who is similarly

located within the District of Columbia.

21.    Due to the decentralized nature of USCIS case processing, which

allows for the transfer of adjustment applications to any USCIS facility located

anywhere in the United States of America, at any time, venue is only appropriate in

the District Court for the District of Columbia.

## V. STATEMENT OF FACTS
### A. Eligibility for Adjustment of Status

22.    On October 7, 2004, Plaintiff filed with the VSC an Application for

Adjustment of Status pursuant to § 245 of the INA, 8 U.S.C. § 1255, to obtain lawful

permanent resident status.  Exhibit A

23.    Plaintiff's adjustment application was properly filed with the VSC but

was subsequently, and without warning, transferred to the TSC.  It is the duty of the

USCIS, regardless of how often and to where it chooses to transfer Plaintiff's

application within its myriad offices, to timely adjudicate his application.

24.    Plaintiff has complied with all requests made by the USCIS to

complete all of the necessary biometrics appointments required by the USCIS. He

has provided all of the information requested by the agency and has complied with

all of the appointment notices.

### B. USCIS and FBI Security Checks

25.    Once an adjustment application is filed, the FBI must conduct

mandatory criminal and national security background checks before an adjudication

of the application is possible.  These security checks include the FBI NNCP check.

*See*, Declaration of Bradley J. Brouillette, Supervisory Center Adjudications Officer

at the VSC, dated April 23, 2007 at page 2, a copy of which is attached and

incorporated hereto as "Exhibit D."

26.    In a majority of FBI NNCP name checks, no "matches" or indications of derogatory information are found.  See, Exhibit D, page 2.

27.    The FBI processes USCIS-requested NNCP checks chronologically, based on the date the request was forwarded.  Initial responses to the NNCP check are generally available within two (2) weeks.  In eighty percent (80%) of applications, no "match" or derogatory information is found.  Of the remaining twenty percent (20%), most NNCP checks are resolved within six (6) months.  See Exhibit D, 6 and USCIS Fact Sheet, dated April 25, 2006, which was referenced in and incorporated into Mr. Brouillette's Declaration, at pages 2-3.

28.    Less that **one percent (1%) of cases** subject to an FBI NNCP check **remain pending longer than six (6) months**.  Exhibit D, CIS Fact Sheet, page 2.

29.    The FBI has stated, in a declaration previously submitted to this Court, that it has historically resolved approximately sixty-eight percent (68%) of NNCP name checks with a "no record" result within **seventy-two (72) hours**.  Of the remaining cases, a secondary check historically has revealed a "no record" result within an additional **thirty to sixty (30-60) days** for twenty-two percent of all cases.  Of the remaining ten percent of cases, less than **one percent (1%)** of USCIS cases are identified with a file containing *possible* derogatory information.  See, Declaration of Michael A. Cannon, dated April 13, 2007 at pages 5-6, a copy of which is attached and incorporated hereto as "Exhibit E."

**C. Exhaustion of Administrative Remedies**

30.    Plaintiff, by himself and through legal counsel, has made repeated inquiries regarding the status of his Application for Adjustment of Status. Plaintiff was advised in writing on several occasions that that the adjudication of his adjustment application has been delayed because of the absence of the required security checks and remained delayed for lack of the security checks.

31.    Plaintiff contacted the USCIS National Customer Service line

approximately every sixty (60) days since December 2004 (approximately twelve [12] times total), but was informed that his adjustment application was being delayed due to security checks.

32.    Plaintiff contacted the office of the Citizenship and Immigration Services Ombudsman (CIS Ombudsman), in writing, on January 19, 2007, but did not receive a written response from the USCIS until July 6, 2007, noting that his adjustment application was being delayed due to incomplete security checks.  *See,* Letters from Ombudsman Prakash Khatri and Constance L. Carter, copies of which are attached and incorporated hereto as "Exhibit F."

33.    Plaintiff contacted the USCIS National Customer Service Center on January 10, 2006 to update his address and was advised that his case has been delayed because of a pending background investigation.  *See,* USCIS Letter to Plaintiff, dated February 13, 2006, a copy of which is attached and incorporated hereto as "Exhibit G."

34.    Plaintiff contacted the Congressman Lloyd Doggett, in writing, but received a written response on April 26, 2007 noting that his adjustment application was transferred to the Texas Service Center and that his fingerprints had expired and that a new fingerprint appointment was needed.  *See,* Letter from Congressman Lloyd Doggett, a copy of which is attached and incorporated hereto as "Exhibit H."

35.    Plaintiff contacted Senator John Cornyn, in writing, on February 10, 2006, but was later informed that his adjustment application was being delayed due to incomplete security checks.

**D. Plaintiff's Mandamus Action**

36.    In order to obtain relief under the Mandamus Act, plaintiff must establish that (1) his claim is "clear and certain;" (2) the duty owed is "ministerial and so plainly prescribed as to be free from doubt;" and (3) that no other adequate remedy is available.  *See,* Patel v. Reno, 134 F.3d 929, 931 (9th Cir. 1997)

37.    Plaintiff has demonstrated through the FBI's own Declaration that Defendant FBI has a non-discretionary duty to complete all USCIS-requested NNCP name checks within a reasonable time.  There is no legal authority for the argument that the FBI may choose not to complete a USCIS-requested NNCP name check. Exhibits D and E

38.    Plaintiff has demonstrated that his claim for relief from the FBI's inaction is clear and certain in that there is no legal authority for the FBI to justify its inaction or to refuse to complete his USCIS-requested NNCP name check.

39.    The FBI's duty to complete Plaintiff's NNCP name check is purely ministerial in nature and so plainly prescribed by Executive Order that the Agency's duty is free from doubt.

40.    Plaintiff's exhaustion of remedies shows that there is no other adequate remedy available to him.

## VI.  INJURIES TO PLAINTIFF

41.    Plaintiff is adversely affected by the Defendant FBI's inaction described above in that his ability to travel abroad and work is restricted during the pendency of his adjustment application period.  Until his FBI NNCP name check is completed, Plaintiff must annually apply and pay for special travel permission and work authorizations.

42.    Plaintiff has lost a significant amount of work time while pursuing his adjustment application, including but not limited to, making inquiries to the USCIS and FBI, meeting with his attorneys, applying for annual work authorization renewals and reporting for fingerprinting.

43.    Due to Defendant FBI's inaction described above, Plaintiff's future naturalization (to become a U.S. Citizen) has been delayed.

## VII. GROUNDS FOR RELIEF

44.    Defendant FBI's inaction and refusal to complete Plaintiff's NNCP screen and to transmit a "FBIQUERY System" response is both arbitrary and capricious, as the FBI has a **mandatory, non-discretionary** duty, as required by law, to complete this process.  5 U.S.C. §701, 702 and 706, et seq. and 5 U.S.C. §555.

45.    Defendant FBI's inaction is a violation of the APA in that it has unlawfully withheld or unreasonably delayed action on Plaintiff's FBI NNCP name check.

46.    The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(l).

47.    Mandamus is a remedy available for extreme agency delay where the agency has not performed a mandatory action. 28 U.S.C. § 1361.

48.    Defendant FBI's inaction is unconstitutional, violates its own procedures, is arbitrary and capricious and Plaintiff seeks a declaration to that effect under the Declaratory Judgment Act at 28 U.S.C. §2201.

49.    If Plaintiff prevails under any of his claims stated herein, he is entitled to recover his attorneys' fees and costs under the EAJA, as amended, 5 U.S.C. §504 and 28 U.S.C. §2412.

## VIII. CLAIMS FOR RELIEF

50.    Defendant FBI has unreasonably delayed and failed to perform a mandatory action in completing Plaintiff's NNCP screen and transmitting a "FBIQUERY System" response to the USCIS, thereby preventing the adjudication of Plaintiff's adjustment application that was filed over two (2) years ago and depriving Plaintiff of his right to lawful permanent residence status and benefits conferred there from including the accrual of time to apply for U.S. citizenship.

51.    Defendant FBI owes Plaintiff the duty to act and complete his NNCP

screen and transmit a "FBIQUERY System" response and has unreasonably failed to perform these duties.

52.     Plaintiff has exhausted any administrative remedies that may exist. No other remedy exists for Plaintiff to resolve Defendant FBI's inaction.

WHEREFORE, Plaintiff prays that this Honorable Court:

(1) Compel the Defendant Attorney General Mukasey and those acting under him to perform their duty to complete Plaintiff's NNCP screen and transmit a "FBIQUERY System" response to the USCIS;

(2) Grant such other and further declaratory, injunctive or equitable relief as this Court deems proper under the circumstances; and

(3) Grant attorney's fees, expenses and costs of court pursuant to the EAJA.

Aron A. Finkelstein, Esquire
DC Bar No. MD25590
Murthy Law Firm
10451 Mill Run Circle
Suite 100
Owings Mills, MD 21117
(410) 356-5440

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

OAM PARKASH,                      )
                                 )
         Plaintiff,              )
                                 )
         v.                      )          Civil Action No. _____
                                 )
CONDOLEEZZA RICE, SECRETARY       )
OF STATE, et al.,                )
                                 )
         Defendants.            )
                                 )
                                 )

<u>**WRIT OF MANDAMUS**</u>

Upon consideration of Plaintiff's Complaint for Writ of Mandamus, and the opposition filed thereto, and the Court having considered the arguments of counsel and the entire record herein, it is hereby,

**ORDERED** that Plaintiff's Complaint for Writ of Mandamus is hereby

_____.

Defendant Federal Bureau of Investigation is hereby **ORDERED** to complete Plaintiff's NNCP check within thirty (30) days of the date of this Order.

Dated this _____ day of _____, 2007.

                                        _____
                                        United States District Judge

# Exhibit A

12/17/2007  04:26    5123209905              OAMPARKASH                        P  02

| | | |
|---|---|---|
| **State of Texas** | ) | **SSN: 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** |
| **County of Travis** | ) | |

### AFFIDAVIT

I, Oam Parkash, after being duly sworn, do hereby state and affirm that:

1. I am a citizen and national of Pakistan, aged 34 years, and am competent to testify to the facts herein.

2. I reside at 2901 Gem Circle, Austin, TX 78704.

3. My date of birth is January 5, 1973 and I was born at Kantio, Pakistan.

4. I filed my Form I-485 Application for Adjustment of Status pursuant to §245 of the Immigration and Nationality Act ("INA"), 8 U.S.C. §1255, on October 7, 2004.

5. My Form I-485 Application for Adjustment has been pending since October 7, 2004 and I have completed all steps and complied with all U.S. Citizenship and Immigration Service ("USCIS") requests regarding my case.

6. I have been informed by multiple government sources that my I-485 Application is being delayed because of an unreasonable agency delay in that the Federal Bureau of Investigations ("FBI") has not completed my National Name Check Program clearance and generated a "FBIQUERY System" response, which is required before the USCIS may approve my Adjustment of Status.

7. I have made numerous requests regarding the status of my delayed I-485 Application including:

   a. Contacting U.S. Senator John Cornyn;

   b. Contacting the USCIS' Vermont Service Center;

   c. Making an official inquiry with the USCIS Ombudsman and;

   d. Making an official inquiry through U.S. Congressman Lloyd Doggett's office.

8. Despite these repeated attempts, and a delay of over three (3) year, my I-485 Application has not been processed due to the FBI NNCP processing delay.

9. Pursuant to the December 2007 Visa Bulletin, issued by the U.S. Department of State, the priority date for processing for EB-2 immigrant visas for Pakistani nationals is current. My priority date for my EB-2 visa is October 7, 2004, which means that my case could be approved at this time, if my FBI NNCP check was completed.

10. Pursuant to the recently released January 2008 Visa Bulletin, the new processing cut-off

12/17/2007  04:26    5123209905                    OAMPARKASH                          03

for EB-2 immigrant visas for Pakistani nationals is current. Based on prior 2007 Visa Bulletins and my priority date, there is no guarantee that an immigrant visa number will be available to me after January 1, 2008. Consequently, even if my I-485 Application could be approved, at this time, issue of my permanent resident card may be further delayed for an unknown period of time.

11. The FBI's unreasonable delay in completing my NNCP check is preventing me from having my I-485 Application adjudicated and is preventing me from becoming a lawful permanent resident and eventually, a U.S. citizen.

I AFFIRM under penalty of perjury and upon personal knowledge that the above statements and facts are true and accurate to the best of my knowledge, information and belief.

Signature: 

Oam Parkash

Date: 12·17·07

STATE OF TEXAS , CITY/COUNTY OF TRAVIS ,TO WIT :

I HEREBY CERTIFY THAT on this 17TH day of DECEMBER, 2007, before me, a Notary Public of the aforesaid State and City/County, personally appeared Oam Parkash, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument, who acknowledged that s/he has executed it for the purposes therein set forth.

FRANCISCA C. WOODWARD
Notary Public, State of Texas
My Comm. Expires 09-17-2011

NOTARY PUBLIC

# Exhibit B

# Visa Bulletin

*Number 113*
*Volume VIII*
*Washington, D.C.*

## VISA BULLETIN FOR DECEMBER 2007

### A. STATUTORY NUMBERS

1. This bulletin summarizes the availability of immigrant numbers during **December**. Consular officers are required to report to the Department of State documentarily qualified applicants for numerically limited visas; the Bureau of Citizenship and Immigration Services in the Department of Homeland Security reports applicants for adjustment of status. Allocations were made, to the extent possible under the numerical limitations, for the demand received by November **13th** in the chronological order of the reported priority dates. If the demand could not be satisfied within the statutory or regulatory limits, the category or foreign state in which demand was excessive was deemed oversubscribed. The cut-off date for an oversubscribed category is the priority date of the first applicant who could not be reached within the numerical limits. Only applicants who have a priority date **earlier than** the cut-off date may be allotted a number. Immediately that it becomes necessary during the monthly allocation process to retrogress a cut-off date, supplemental requests for numbers will be honored only if the priority date falls within the new cut-off date.

2. Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference limit of 226,000. The worldwide level for annual employment-based preference immigrants is at least 140,000. Section 202 prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620. The dependent area limit is set at 2%, or 7,320.

3. Section 203 of the INA prescribes preference classes for allotment of immigrant visas as follows:

### FAMILY-SPONSORED PREFERENCES

**First:** Unmarried Sons and Daughters of Citizens: 23,400 plus any numbers not required for fourth preference.

**Second:** Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents: 114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, and any unused first preference numbers:

A. Spouses and Children: 77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. Unmarried Sons and Daughters (21 years of age or older): 23% of the overall second preference limitation.

**Third:** Married Sons and Daughters of Citizens: 23,400, plus any numbers not required by first and second preferences.

**Fourth:** Brothers and Sisters of Adult Citizens: 65,000, plus any numbers not required by first three preferences.

### EMPLOYMENT-BASED PREFERENCES

**First:** Priority Workers: 28.6% of the worldwide employment-based preference level, plus any numbers not required for fourth and fifth preferences.

**Second:** Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability: 28.6% of the worldwide employment-based preference level, plus any numbers not required by first

preference.

**Third:** Skilled Workers, Professionals, and Other Workers: 28.6% of the worldwide level, plus any numbers not required by first and second preferences, not more than 10,000 of which to "Other Workers".

**Fourth:** Certain Special Immigrants: 7.1% of the worldwide level.

**Fifth:** Employment Creation: 7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of P.L. 102-395.

4. INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligible immigrants in the order in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of preference immigrants are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal. The visa prorating provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceeds the per-country limit. These provisions apply at present to the following oversubscribed chargeability areas: CHINA-mainland born, INDIA, MEXICO, and PHILIPPINES.

5. On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available. (NOTE: Numbers are available only for applicants whose priority date is **earlier** than the cut-off date listed below.)

| Family | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPP-INES |
|---|---|---|---|---|---|
| 1st | 08JAN02 | 08JAN02 | 08JAN02 | 01JUL92 | 22SEP92 |
| 2A | 15JAN03 | 15JAN03 | 15JAN03 | 01MAY02 | 15JAN03 |
| 2B | 15OCT98 | 15OCT98 | 15OCT98 | 15MAR92 | 01JAN97 |
| 3rd | 08APR00 | 08APR00 | 08APR00 | 08JUL92 | 01APR91 |
| 4th | 22JUN97 | 08OCT96 | 15AUG96 | 22SEP94 | 08NOV85 |

**\*NOTE:** For December, 2A numbers **EXEMPT from per-country limit** are available to applicants from all countries with priority dates **earlier** than 01MAY02. 2A numbers **SUBJECT to per-country limit** are available to applicants chargeable to all countries **EXCEPT MEXICO** with priority dates beginning 01MAY02 and earlier than 15JAN03. (All 2A numbers provided for MEXICO are exempt from the per-country limit; there are no 2A numbers for MEXICO subject to per-country limit.)

| | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIP-PINES |
|---|---|---|---|---|---|
| Employment-Based | | | | | |
| 1st | C | C | C | C | C |
| 2nd | C | 01JAN03 | 01JAN02 | C | C |
| 3rd | 01SEP02 | 15OCT01 | 01MAY01 | 22APR01 | 01SEP02 |

| Other Workers | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 |
|---|---|---|---|---|---|
| 4th | C | C | C | C | C |
| Certain Religious Workers | C | C | C | C | C |
| 5th | C | C | C | C | C |
| Targeted Employment Areas/ Regional Centers | C | C | C | C | C |

The Department of State has available a recorded message with visa availability information which can be heard at: (area code 202) 663-1541. This recording will be updated in the middle of each month with information on cut-off dates for the following month.

Employment Third Preference Other Workers Category: Section 203(e) of the NACARA, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002.

## B. DIVERSITY IMMIGRANT (DV) CATEGORY

Section 203(c) of the Immigration and Nationality Act provides a maximum of up to 55,000 immigrant visas each fiscal year to permit immigration opportunities for persons from countries other than the principal sources of current immigration to the United States. The Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulates that beginning with DV-99, and for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for use under the NACARA program. **This reduction has resulted in the DV-2008 annual limit being reduced to 50,000.** DV visas are divided among six geographic regions. No one country can receive more than seven percent of the available diversity visas in any one year.

For **December**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 11,100 | Except: Egypt: 8,400 Ethiopia: 6,950 Nigeria: 6,900 |
| ASIA | 4,750 | |
| EUROPE | 11,100 | |
| NORTH | | |

| AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 675 | |
| SOUTH AMERICA, and the CARIBBEAN | 900 | |

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which the applicant is selected in the lottery. The year of entitlement for all applicants registered for the DV-2008 program ends as of September 30, 2008. DV visas may not be issued to DV-2008 applicants after that date. Similarly, spouses and children accompanying or following to join DV-2008 principals are only entitled to derivative DV status until September 30, 2008. DV visa availability through the very end of FY-2008 cannot be taken for granted. Numbers could be exhausted prior to September 30.

## C. ADVANCE NOTIFICATION OF THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH WILL APPLY IN JANUARY

For **January**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
| --- | --- | --- |
| AFRICA | 13,100 | Except: Egypt: 11,000 Ethiopia: 8,600 Nigeria: 7,200 |
| ASIA | 6,100 | |
| EUROPE | 13,600 | |
| NORTH AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 775 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,075 | |

## D. CHINA-MAINLAND BORN AND INDIA EMPLOYMENT SECOND PREFERENCE CUT-OFF DATES RETROGRESS FOR DECEMBER

It has been necessary to retrogress both the China-mainland born and India Employment Second preference cut-off dates. This is a direct result of extraordinarily heavy applicant demand for numbers, primarily by Citizenship and Immigration Services offices for adjustment of status cases. Additional retrogressions cannot be ruled out during the second quarter of the fiscal year.

## E. IMMIGRANT VISA AVAILABILITY DURING THE COMING MONTHS

The following projections are based on the demand patterns which are currently being experienced. Fluctuations in demand could alter such projections at any time. Therefore, they should only be used as a guideline of what might occur. Under no circumstances should they be used as a basis for making any formal plans prior to the announcement of the monthly cut-off dates.

**Family Preferences - Worldwide:** Movement consistent with that of recent months can be expected for the foreseeable future.

**Employment Preferences - Worldwide and Philippines**:

First:  Will remain "Current"

Second:  Will remain "Current"

Third:  Slow forward movement should be possible while demand patterns are established.

Third "Other Workers" (All Countries):  Little if any forward movement is expected at this time.  Should the current demand pattern continue, it may be necessary to retrogress the cut-off date at some point later in the fiscal year.

**CHINA-mainland born and INDIA**:

Employment Preferences:

First:  Continued heavy demand may require the establishment of a cut-off date at some point during the fiscal year.

Second:  Demand during October and the first week of November has already used over 38 percent of the annual limit.  It is hoped that the December retrogressions will return monthly number use within the target range.  If not, further retrogressions cannot be ruled out.

## F. OBTAINING THE MONTHLY VISA BULLETIN

The Department of State's Bureau of Consular Affairs offers the monthly "Visa Bulletin" on the INTERNET'S WORLDWIDE WEB.  The INTERNET Web address to access the Bulletin is:

**http://travel.state.gov**

From the home page, select the VISA section which contains the Visa Bulletin.

To be **placed on** the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type:
**Subscribe Visa-Bulletin** *First name/Last name*
*(example:  Subscribe Visa-Bulletin  Sally Doe)*

To be **removed from** the Department of State's E-mail subscription list for the  "Visa Bulletin", send an e-mail message to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type: **Signoff Visa-Bulletin**

The Department of State also has available a recorded message with visa cut-off dates which can be heard at: (area code 202) 663-1541. The recording is normally updated by the middle of each month with information on cut-off dates for the following month.

Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

**VISABULLETIN@STATE.GOV**

(This address cannot be used to subscribe to the Visa Bulletin.)

Department of State Publication 9514
CA/VO:November 13, 2007

# Exhibit C

# Visa Bulletin

Number 114
Volume VIII
Washington, D.C.

## VISA BULLETIN FOR JANUARY 2008

### A. STATUTORY NUMBERS

1. This bulletin summarizes the availability of immigrant numbers during **January**. Consular officers are required to report to the Department of State documentarily qualified applicants for numerically limited visas; the Bureau of Citizenship and Immigration Services in the Department of Homeland Security reports applicants for adjustment of status. Allocations were made, to the extent possible under the numerical limitations, for the demand received by December **10th** in the chronological order of the reported priority dates. If the demand could not be satisfied within the statutory or regulatory limits, the category or foreign state in which demand was excessive was deemed oversubscribed. The cut-off date for an oversubscribed category is the priority date of the first applicant who could not be reached within the numerical limits. Only applicants who have a priority date **earlier than** the cut-off date may be allotted a number. Immediately that it becomes necessary during the monthly allocation process to retrogress a cut-off date, supplemental requests for numbers will be honored only if the priority date falls within the new cut-off date.

2. Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference limit of 226,000. The worldwide level for annual employment-based preference immigrants is at least 140,000. Section 202 prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620. The dependent area limit is set at 2%, or 7,320.

3. Section 203 of the INA prescribes preference classes for allotment of immigrant visas as follows:

### FAMILY-SPONSORED PREFERENCES

**First:** Unmarried Sons and Daughters of Citizens:  23,400 plus any numbers not required for fourth preference.

**Second:** Spouses and Children, and Unmarried Sons and Daughters of Permanent

Residents:  114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, and any unused first preference numbers:

A. Spouses and Children:  77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. Unmarried Sons and Daughters (21 years of age or older):  23% of the overall second preference limitation.

**Third:** Married Sons and Daughters of Citizens:  23,400, plus any numbers not required by first and second preferences.

**Fourth:** Brothers and Sisters of Adult Citizens:  65,000, plus any numbers not required by first three preferences.

### EMPLOYMENT-BASED PREFERENCES

**First:** Priority Workers:  28.6% of the worldwide employment-based preference level, plus any numbers not required for fourth and fifth preferences.

**Second:** Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability:

Visa Bulletin for January 2008

28.6% of the worldwide employment-based preference level, plus any numbers not required by first preference.

**Third:** Skilled Workers, Professionals, and Other Workers: 28.6% of the worldwide level, plus any numbers not required by first and second preferences, not more than 10,000 of which to "Other Workers".

**Fourth:** Certain Special Immigrants: 7.1% of the worldwide level.

**Fifth:** Employment Creation: 7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of P.L. 102-395.

4. INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligible immigrants in the order in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of preference immigrants are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal. The visa prorating provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceeds the per-country limit. These provisions apply at present to the following oversubscribed chargeability areas: CHINA-mainland born, INDIA, MEXICO, and PHILIPPINES.

5. On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available. (NOTE: Numbers are available only for applicants whose priority date is **earlier** than the cut-off date listed below.)

| Fam-ily | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPP-INES |
|---|---|---|---|---|---|
| 1st | 01FEB02 | 01FEB02 | 01FEB02 | 01JUL92 | 22NOV92 |
| 2A | 22FEB03 | 22FEB03 | 22FEB03 | 01MAY02 | 22FEB03 |
| 2B | 22NOV98 | 22NOV98 | 22NOV98 | 22MAR92 | 15JAN97 |
| 3rd | 08MAY00 | 08MAY00 | 08MAY00 | 08JUL92 | 01APR91 |
| 4th | 08JUL97 | 01NOV96 | 15SEP96 | 01OCT94 | 01FEB86 |

*NOTE: For January, 2A numbers **EXEMPT from per-country limit** are available to applicants from all countries with priority dates **earlier** than 01MAY02. 2A numbers **SUBJECT to per-country limit** are available to applicants chargeable to all countries **EXCEPT MEXICO** with priority dates beginning 01MAY02 and earlier than 22FEB03. (All 2A numbers provided for MEXICO are exempt from the per-country limit; there are no 2A numbers for MEXICO subject to per-country limit.)

| | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIP-PINES |
|---|---|---|---|---|---|
| Employ-ment-Based | | | | | |
| 1st | C | C | C | C | C |
| 2nd | C | 01JAN03 | 01JAN00 | C | C |
| 3rd | 15OCT02 | 01NOV01 | 01MAY01 | 22APR01 | 15OCT02 |

| Other Workers | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 | 01OCT01 |
|---|---|---|---|---|---|
| 4th | C | C | C | C | C |
| Certain Religious Workers | C | C | C | C | C |
| 5th | C | C | C | C | C |
| Targeted Employ-ment Areas/ Regional Centers | C | C | C | C | C |

The Department of State has available a recorded message with visa availability information which can be heard at: (area code 202) 663-1541. This recording will be updated in the middle of each month with information on cut-off dates for the following month.

Employment Third Preference Other Workers Category: Section 203(e) of the NACARA, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002.

## B. DIVERSITY IMMIGRANT (DV) CATEGORY

Section 203(c) of the Immigration and Nationality Act provides a maximum of up to 55,000 immigrant visas each fiscal year to permit immigration opportunities for persons from countries other than the principal sources of current immigration to the United States. The Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulates that beginning with DV-99, and for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for use under the NACARA program. **This reduction has resulted in the DV-2008 annual limit being reduced to 50,000.** DV visas are divided among six geographic regions. No one country can receive more than seven percent of the available diversity visas in any one year.

For **January**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 13,100 | Except: Egypt: 11,000 Ethiopia: 8,600 Nigeria: 7,200 |
| ASIA | 6,100 | |
| EUROPE | 13,600 | |
| NORTH | | |

| | | |
|---|---|---|
| AMERICA (BAHAMAS) | 3 | |
| OCEANIA | 775 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,075 | |

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which the applicant is selected in the lottery. The year of entitlement for all applicants registered for the DV-2008 program ends as of September 30, 2008. DV visas may not be issued to DV-2008 applicants after that date. Similarly, spouses and children accompanying or following to join DV-2008 principals are only entitled to derivative DV status until September 30, 2008. DV visa availability through the very end of FY-2008 cannot be taken for granted. Numbers could be exhausted prior to September 30.

## C. ADVANCE NOTIFICATION OF THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH WILL APPLY IN FEBRUARY

For **February**, immigrant numbers in the DV category are available to qualified DV-2008 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers **BELOW** the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | 16,200 | Except: Egypt: 13,300 Ethiopia: 10,200 Nigeria: 7,700 |
| ASIA | 6,900 | |
| EUROPE | 15,300 | |
| NORTH AMERICA (BAHAMAS) | 5 | |
| OCEANIA | 850 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,175 | |

## D. INDIA EMPLOYMENT SECOND PREFERENCE CUT-OFF DATE RETROGRESSION FOR JANUARY

It has been necessary to once again retrogress the India Employment Second preference cut-off date. This is a direct result of continued heavy applicant demand for numbers by CIS for adjustment of status cases despite the retrogression which occurred for December. It is likely that the annual limit for this category will be reached within the next few months, at which time the category would become "unavailable" for the remainder of fiscal year 2008.

## E. OBTAINING THE MONTHLY VISA BULLETIN

The Department of State's Bureau of Consular Affairs offers the monthly "Visa Bulletin" on the INTERNET'S WORLDWIDE WEB. The INTERNET Web address to access the Bulletin is:

**http://travel.state.gov**

From the home page, select the VISA section which contains the Visa Bulletin.

To be **placed on** the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type:
**Subscribe Visa-Bulletin** *First name/Last name*
*(example: Subscribe Visa-Bulletin Sally Doe)*

To be **removed from** the Department of State's E-mail subscription list for the "Visa Bulletin", send an e-mail message to the following E-mail address:

**listserv@calist.state.gov**

and in the message body type: **Signoff Visa-Bulletin**

The Department of State also has available a recorded message with visa cut-off dates which can be heard at: (area code 202) 663-1541. The recording is normally updated by the middle of each month with information on cut-off dates for the following month.

Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

**VISABULLETIN@STATE.GOV**

(This address cannot be used to subscribe to the Visa Bulletin.)

Department of State Publication 9514
CA/VO: December 10, 2007

# Exhibit D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Case No.: 1:07CV00263

Zaigang Liu,

   Plaintiff,

  vs.       Declaration of Bradley J. Brouillette

Paul Novak, Director, Vermont Service Center
U.S Department of Homeland Security, U.S.
Citizenship and Immigration Services; Emilio
Gonzalez, Director, U.S. Citizenship and
Immigration Services; Robert S. Mueller, III,
Director, Federal Bureau of Investigation,

   Defendants

I, BRADLEY J. BROUILLETTE declare as follows:

1. I am employed by the United States Citizenship and Immigration Services (hereinafter "USCIS") as a Supervisory Center Adjudications Officer at the Vermont Service Center (hereinafter "VSC"), in St. Albans, Vermont. I have held this position since December 2003. I have been employed by the agency in various capacities since November 1995. I make this declaration based on my personal knowledge and my review of official documents and records maintained by the USCIS. If called to testify, I could and would do so competently.

2. This declaration is submitted in support of Defendants' motion to dismiss in the case of Zaigang Liu v. Novak et al., 1:07CV00263, now pending before the United States District Court for the District of Columbia. It provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file.

1

3.  When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks. These checks are conducted both to enhance national security and ensure the integrity of the immigration process. These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. Pursuant to established agency policy, all required security checks must be completed prior to adjudication of the application.

4.  The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the

2

1     results of an IBIS query are usually available immediately, in some cases information

2     found will require further investigation. Finally, FBI fingerprint checks provide

3     information relating to criminal background within the United States. Results are

4     usually received within days and while the vast majority results in no criminal record,

5     positive results may have a direct bearing on the eligibility of an applicant for the

6     immigration benefit being sought.

7   5.   Once USCIS receives an I-485 a file is opened and an electronic record of that

8     application is created. Much of this initial electronic processing and data entry is

9     automated, including the automatic generation and electronic transmission of a FBI name

10     check request in FBIQUERY, the FBI repository and tracking system for FBI Name

11     Check requests. Once the initial file creation and processing of an I-485 application is

12     complete, each file is placed on an I-485 pending shelf for processing and adjudication in

13     chronological order according to date of receipt.

14

15   6.   Due to bi-specialization, the VSC no longer accepts any new I-485 applications. All

16     pending cases being held for FBI name and date of birth check clearance and Visa

17     Availability have been sent to the Texas Service Center. The VSC has retained

18     approximately 15,000 pending cases in which the adjudicative process had already begun

19     and the adjudication of those cases will be completed at the VSC.

20

21   7.   VSC periodically runs an electronic report in FBIQUERY system for all files on the I-

22     485 pending shelf to confirm the successful transmission of the FBI Name Check request

23     and to identify those applications that have received responses from the FBI name checks

24     and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests

25     that have been received by the FBI but have not yet been completed are indicated by a

26     notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will

27

3

1    be indicated by various entries depending on the result, including No Record, Positive

2    Response, etc.

3    8.    This report will also identify those I-485 applications that have received a "No Data" or

4    "Error" response in FBIQUERY indicating a problem with transmission of the name

5    check request from USCIS to the FBI.  If such a problem is reported, the FBI name check

6    requests will then be initiated a second time and resent manually or electronically to the

7    FBI for a response.  In this way USCIS ensures that the FBI has in fact received all

8    requests for name checks.

9

10    9.    All files on the FBI Name Check Shelf are audited regularly in order to identify those in

11    which a response from the FBI has been received.  This audit is conducted at least every

12    three weeks or more often.  In this manner the agency ensures that as FBI responses are

13    received, files are expeditiously released for adjudication.  FBIQUERY reports do not

14    provide USCIS with any indication as to what information the FBI may have relating to a

15    particular alien, whether an FBI investigation into the particular alien has been

16    undertaken, or whether there are national security concerns relating to that alien.

17

18    10.    For most applicants, USCIS can quickly determine if there are criminal or security

19    related issues in the applicant's background that affect eligibility for immigration

20    benefits.  However, due both to the sheer volume of security checks USCIS conducts,

21    and the fact that USCIS must await responses from the FBI or other relevant agencies

22    that conduct some of the required security checks, some delays on individual

23    applications are unavoidable  and may be lengthy.  Moreover, in some cases a

24    background or security check will reveal that positive (derogatory) information on the

25    subject alien is possessed by some agency other than USCIS without necessarily

26    revealing the substance of that information.  In such cases, USCIS works closely with

27    the other law enforcement or intelligence agencies to obtain all available information

4

1   concerning the positive result in order to properly evaluate its significance. Even where

2   the FBI or a third agency has provided a final response, a case may still be considered

3   pending where the response requires further investigation or review by USCIS or

4   another agency.  It is vitally important to thoroughly screen each applicant in order to

5   resolve all concerns of a law enforcement or national security nature before determining

6   that an individual is eligible for an immigration benefit.

7   11.   The agency's policy for requesting expedited security checks requires that the applicant

8   meet one of the following criteria:

9          1.   Military Deployment.

10         2.   Age-out cases not covered by the Child Status Protection Act and applications

11              affected by sunset provisions such as the Diversity Visa Program.

12         3.   Compelling reasons provided by the requesting office such as critical medical

13              conditions.

14         4.   Loss of Social Security benefits or other subsistence at the discretion of the

15              Director.

16   U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the

17   FBI to expedite a name check when the only reason for the request is that a mandamus

18   (or other federal court petition) is filed in the case.

19

20   12.   USCIS reports the average processing times for specific applications and petitions on the

21   USCIS website.  This information reflects only average processing times on the date the

22   information is published.  Average processing times fluctuate widely and will sometimes

23   even regress for a specific form type due to a number of factors, including a reallocation

24   of agency resources, reordering of the agency's priorities, and other reasons.

25   Additionally, not every application will require the same level of inquiry.  Some may

1   require a more detailed level of review and or investigation from either the USCIS or

2   other agencies for a number of reasons ranging from the alien's eligibility for the benefit

3   sought to national security concerns. Accordingly, even when it appears that the

4   adjudication of a particular application is outside the average processing time, this does

5   not establish that the delay is unreasonable or even due to factors within the control of

6   USCIS.

7

8   13.   The FBI has an established process of processing FBI Name Check requests from USCIS

9   chronologically based on the date the request is forwarded. As stated above, certain

10   requests can be expedited if they meet specific expedite criteria. However, it is important

11   to note that whenever a particular application or petition receives expedited processing

12   and is moved up in the queue, it is at the expense of those still unadjudicated petitions or

13   applications that bear an earlier filing date. There is no statutory or regulatory time limit

14   for the adjudication of I-485s. Moreover, an alien who has applied for adjustment of

15   status may apply for and obtain employment authorization for the entire time his or her

16   application is pending. Most applicants for adjustment of status may also apply for and

17   obtain advance parole to enable them to travel abroad during the pendency of their

18   application. Thus, applicants for adjustment of status are not as adversely affected by

19   delays in the adjudication of their applications as are aliens filing for other immigration

20   benefits.

21

22   14.   In my capacity as a Supervisory Center Adjudications Officer at the VSC, I have access

23   to the official files and records of the USCIS. I have reviewed the system records for

24   plaintiff LIU, Zaigang, A97 486 586. The record reflects that on July 23, 2003, plaintiff

25   Liu filed an application for adjustment of status to permanent resident on Form I-485.

26

27

1    Plaintiff seeks adjustment as a derivative beneficiary on an approved I-140 employment

2    based visa petition for his spouse Lu Zhang. To date, plaintiff's application remains

3    pending the completion of security checks. Once the required security checks are

4    completed, the plaintiff's application will be adjudicated.

5  15.  Because the plaintiff's case does not meet one of the above-mentioned expedite criteria,

6    the agency is unable to request an expedite of the security check clearance on his behalf.

7    For this reason the USCIS cannot adjudicate plaintiff's I-485 application for adjustment

8

9    of status until such time as all security checks are complete.

10

11    I declare under penalty of perjury that the foregoing is true and correct. Executed this

12    23rd day of April, 2007 at St. Albans, Vermont.

13

14

15

16    Bradley J. Brouillette
    Supervisory Center Adjudications Officer
    Vermont Service Center

17

18

19

20

21

22

23

24

25

26

27

*Press Office*
U.S. Department of Homeland Security



U.S. Citizenship
and Immigration
Services

April 25, 2006

# Fact Sheet

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# Exhibit D
# Part 2

# Exhibit E

APR-20-2007  16:24        FBI/OGC                    202 220 9347    P.002

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ZIAGANG LIU,

Plaintiff,

v.                                      Case No:
                                        07-CV-00263
PAUL NOVAK,
        et al.,

Defendants.

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program

Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.

I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name

Check Units. The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am aware of the name check request for Zaigang Liu, the plaintiff in this civil

action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of

disseminating information from the FBI's Central Records System in response to requests

submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

(7)   Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)   The entries in the General Indices fall into two categories:

(a)   "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)   "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)   In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)   Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)   Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)  Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)  The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)  When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)   Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)   Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)   Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)   The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)   The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)   It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

## PLAINTIFF'S NAME CHECK REQUEST

(22)   The name check request for plaintiff Zaigang Liu was received by the FBI from USCIS on or about March 30, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _13th_ day of April 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

# Exhibit F

11/27/2007  02:01    51232099?          OAMPARKASH                              PAGE  07



*Office of the*
*Citizenship and Immigration Services Ombudsman*

**U.S. Department of Homeland Security**
Mail Stop 1225
Washington, D.C. 20528-1225

# Homeland
# Security

March 6, 2007

Mr./Ms. Oam Parkash
2901 Gem Circle
Austin, TX 78704

Dear Mr./Ms. Parkash:

Thank you for your recent inquiry regarding your immigration issue.

Upon receipt of your information, the office of the Citizenship and Immigration Services
Ombudsman (CIS Ombudsman) initiated a formal inquiry with the U.S. Citizenship and
Immigration Services (USCIS). USCIS should issue a response to you within forty-five
(45) days. If you do not receive a response within this period, please notify our office.

Please be aware that although the office of the CIS Ombudsman collaborates with
USCIS, it is an independent entity within the Department of Homeland Security (DHS).
The office of the CIS Ombudsman is charged with assisting individuals who experience
difficulties with the USCIS benefits process. Additionally, the office of the CIS
Ombudsman is dedicated to identifying systemic problems in the immigration benefits
process, and to recommending solutions to USCIS. Therefore, the concerns you raised in
your letter will be considered as our office develops recommendations to improve
USCIS' administrative practices.

Once again, thank you for contacting the office of the CIS Ombudsman, and for giving us
the opportunity to serve you.

Sincerely,

Prakash Khatri
Ombudsman

PIK/bh

Email:  cisombudsman@dhs.gov                Web:  http://www.dhs.gov/cisombudsman

PAGE  08

11/27/2007  02:01    5123209996                    OAMPARKASH

U.S. Department of Homeland Security
Washington, DC 20529



U.S. Citizenship
and Immigration
Services

HQCIS 181/48.2-C

'JUL 0 6 2007

Mr. Oam Parkash
2901 Gem Circle
Austin, TX 78704

Dear Mr. Parkash:

Thank you for your letter dated January 19, 2007, to the U.S. Citizenship and Immigration
Services Ombudsman (CISO). Your letter concerning your immigration status was assigned
case # 623622 and forwarded to the Customer Assistance Office for a response.

We regret the length of time it has taken to process your Form I-485, Application to Register
Permanent Residence or Adjust Status. We have researched your case to determine the status of
your application. Our records reflect that the processing of your case has been delayed because
the required investigation into your background is still in process. Until the background
investigation is completed, we cannot move forward on your case.

Please understand that these background checks are required to be completed on all applicants
who apply for the immigration benefit you are seeking. Attached, you will find two enclosures
with detailed information regarding why the process exists, how it works, as well as the
circumstances when the process can be expedited.

While an exact date for completion of your background check cannot be given at this time, we
will make every effort to make a decision on this case as soon as the background checks are
complete.

11/27/2007  02:01    51232055t                    OAMPARKASH

Mr. Oam Parkash
Page 2

We appreciate your continued patience.  If you need additional assistance and/or filing
instructions, we invite you to contact the USCIS National Customer Service Center at 1-800-
375-5283 or visit our web site at www.uscis.gov.

Sincerely,


Constance L. Carter, Supervisor
Customer Assistance Office
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

Enclosure:     Fact Sheet, 'Immigration Security Checks- How and Why the Process Works'.
               USCIS Update, "USCIS Clarifies Criteria To Expedite FBI Name Check"



Office of Communications
U.S. Department of Homeland Security

U.S. Citizenship
and Immigration
Services

February 20, 2007

# USCIS Update

## USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK
### Federal Litigation Removed as Sole Basis to Expedite Check

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

USCIS may continue to request an expedited FBI name check if the case meets one of the other approved criteria, including:

1. Military deployment,
2. Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas,
3. Significant and compelling reasons, such as critical medical conditions, and
4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

The FBI name check is an invaluable part of the security screening process, ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. USCIS also requests an FBI name check to screen out people who seek immigration benefits improperly or fraudulently and ensure that only eligible applicants receive benefits.

Information about the FBI name check is available on the USCIS website at http://www.uscis.gov or by calling the USCIS National Customer Service Center toll free at 1-800-375-5283.

– USCIS –

On March 1, 2003, U.S Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.  USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services, while enhancing our nation's security.

11/27/2007  02:01   51232            DAMPARKASH                     PAGE  04



*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

11/27/2007  02:01    512320998              OAMPARKASH

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.   The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# Exhibit G

11/27/2007  02:01    51232099              OAMPARKASH



U.S. Department of Homeland Security
Vermont Service Center
75 Lower Welden Street
St. Albans, VT
05479-0001

## U.S. Citizenship
## and Immigration
## Services

Monday, February 13, 2006

OAM PARKASH
2901 GEM CIR
AUSTIN TX 78704

Dear OAM PARKASH:

On 01/10/2006 you, or the designated representative shown below, contacted us about your case.  Some of the key information given to us at that time was the following:

| | |
|---|---|
| Caller indicated they are: | The applicant |
| Attorney Name: | Information not available |
| Case type: | I485 |
| Filing date: | 10/07/2004 |
| Receipt #: | EAC-05-008-52100 |
| Beneficiary (if you filed for someone else): | PARKASH, OAM |
| Your USCIS Account Number (A-number): | A98586297 |
| Type of service requested: | Case Status - Outside Processing Time |
| | Change of Address |

The status of this service request is:

Recently, you called us to update your address.  We have updated your address in our systems and on your application or petition.  Thank you for notifying us of your change of address.  If you change your address again in the future, please contact customer service at the number provided below.

The processing of your case has been delayed.  A check of our records establishes that your case is not yet ready for decision, as the required  investigation into your background remains open.

Until the background investigation is completed, we cannot move forward on your case.  These background checks are required to be completed on all applicants who apply for the immigration benefit you are seeking. We will make every effort to make a decision on this case as soon as the background checks are complete.  If you do not receive a decision or other notice of action from us within 6 months of this letter, please contact us by calling our customer service number provided below.

If you have any further questions, please call the National Customer Service Center at 1-800-375-5283.

One final note: When you called you or your representative asked that we update your address on your pending case for the purpose of processing.  We have updated your address.  Your address now appears on your application or petition as the address shown above.

U.S. CIS - 02-13-2006 09:55 AM EST - EAC-05-008-52100

# Exhibit H

11/27/2007  02:01    51232095C          OAMPARKASH

**LLOYD DOGGETT**
25TH DISTRICT, TEXAS

———

COMMITTEE ON
WAYS AND MEANS

SUBCOMMITTEE ON
HEALTH



## Congress of the United States
## House of Representatives

April 26, 2007

WASHINGTON OFFICE:
201 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4865

DISTRICT OFFICES:
211 NORTH 15TH STREET
MCALLEN, TX 78501
(956) 687-5921

300 EAST 8TH STREET, SUITE 763
AUSTIN, TX 78701
(512) 916-5921

E-MAIL: LLOYD.DOGGETT@MAIL.HOUSE.GOV
www.house.gov/doggett/
1-866-916-5921

Mr. Oam Parkash
2901 Gem Circle
Austin, Texas 78704

Dear Oam:

I have received additional information from the US Citizenship and Immigration Services (USCIS) regarding your case. Recently, your case was transferred to the Texas Service Center. Because your fingerprints have expired, you will receive notice of a new fingerprint appointment.

Please let us know if you have any additional information or if there have been any changes in your situation. Enclosed is additional information on the USCIS security clearance process.

Sincerely,

Lloyd Doggett

LD:nc
Enclosure

11/27/2007  02:01    51232          OAMPARKASH                                    PAGE  05

U.S. Department of Homeland Security
8101 N. Stemmons Freeway
Dallas, TX 75247



**U.S. Citizenship
and Immigration
Services**

Thank you for your inquiry on behalf of the constituent who is concerned that their
I-485 has been pending without resolution. A check of our records establishes that the application is
not yet ready for decision, as the investigation into the background remains open. Until the
background investigation is completed, we cannot move forward on the case.

We understand your constituent is frustrated by the progress of their application. In order to fulfill
its mission to provide immigration benefits and services to the public, USCIS must balance its
obligations to the individual applicant against its obligations to the public as a whole. While we
strive to process applications timely and fairly, we must also ensure that our policies and procedures
will safeguard the public. Consequently, we have adopted background security check procedures
that address a wide range of possible risk factors, requiring various levels of scrutiny based on the
type of application under consideration.

Given the number of applications submitted and the significance of immigration benefits, it is
inevitable that some applications will require more attention than others. USCIS relies primarily on
three background check mechanisms: the Interagency Border Inspection System (IBIS) name check,
the FBI fingerprint check, and the FBI name check (see attachment). For the vast majority of
applicants, these mechanisms allow USCIS to quickly determine whether there are any criminal or
security related eligibility issues. In the remaining cases, often referred to as "pending," a match of
some kind has been identified and must be resolved before any decision can be made on the petition
or application. USCIS does not share with applicants or their representatives information regarding
the specific nature of the match or the nature or status of any investigation.

These background checks allow USCIS to ensure public safety by screening out individuals
improperly seeking immigration benefits, and have in the past uncovered applicants convicted of
rape and child molestation, applicants involved in drug trafficking, and even applicants with known
links to terrorism. Even when the issues are ultimately resolved in the applicant's favor—and the
vast majority are—such investigations require time, resources, and patience.

We are committed to working with Congress to ensure that cases are processed within a reasonable
period of time. In some cases, however, security concerns will not permit us to go forward. We ask

for your patience in such cases, and in return we promise to continue to seek resolution as quickly as possible in each individual case.  Summary of Primary Background Checks

- IBIS allows USCIS to quickly check numerous government databases to determine whether any applicant, petitioner, or beneficiary is associated with negative factors affecting eligibility for benefits.  Results of an IBIS check are generally available immediately.  In some cases, negative information found during an IBIS check will require further investigation.

- FBI fingerprint checks are conducted for many applications. This check allows USCIS to quickly learn whether an applicant may have a criminal history in the United States. Generally, the FBI forwards responses within 24-48 hours.  In the event that there is a record match, the FBI forwards an electronic copy of the criminal history to USCIS.  At that point, an adjudicator must review the information and determine what effect it may have on continuing eligibility for the benefit.  While the vast majority of inquiries yield no record or match, approximately 10 per cent do uncover a criminal arrest or conviction.  In those cases involving criminal arrests or charges without disposition, USCIS will require the applicant to provide court certified evidence of the disposition.

- FBI name checks are also initiated for many applications.  Multiple FBI databases are searched to determine whether an individual has been encountered by the FBI in connection with an investigation of criminal, security, or other activities that might render him or her ineligible for benefits.  Initial responses to this check generally take about two weeks.  In approximately 80% of the cases, no match is found.  In the remaining 20 percent, most are resolved within 6 months.  Less than one per cent of the cases subject to an FBI name check remain pending longer than six months.  Some of these cases may be classified or involve highly sensitive information that will not be resolved quickly.

Sincerely,

Angela K. Barrows
District Director

# Exhibit E



Home   Contact Us   Site Map   FAQ

Search
Advanced Search 

Services & Benefits    Immigration Forms    Laws & Regulations    About USCIS    Education & Resource    Press Room

Print This Page        Back

## U.S. Citizenship and Immigration Services
## Vermont Service Center Processing Dates
## Posted November 14, 2007

The processing times shown below are a tool for our customers to gauge our current processing times. When applications and petitions are completed within our target timeframes, that goal will be shown in the data display.

The processing times shown below are for applications that have just been completed. If you have just filed your application, these timeframes may not reflect how long your application will take to be completed. We encourage you to check this page periodically before inquiring about your case. The processing times are updated monthly.

USCIS has received a significant increase in the number of applications filed. In July and August, nearly 2.5 million applications and petitions of all types were received. This compares to 1.2 million applications and petitions received in the same time period last year. This fiscal year, we received 1.4 million applications for naturalization; nearly double the volume we received the year before. The agency is working to improve processes and focus increased resources, including hiring approximately 1,500 new employees, to address this workload.

As a result, average processing times for certain application types may be longer. In particular, naturalization applications filed after June 1, 2007 may take approximately 16-18 months to process.

We offer a variety of services after you file.  For example, for most kinds of cases you can check the status of your case online.

For more information about when and how to contact us, whether your case is outside our processing time or if there are other issues, please see our customer guide –

Case Services - How do I... know what kind of services are available to me after I file my application or petition?

Service Center Processing Dates for **Vermont Service Center** Posted November 14, 2007

| Form | Title | Classification or Basis for Filing | Processing Timeframe |
|------|-------|-----------------------------------|---------------------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance or replacement | 6 Months |
| I-90A | Application to Replace Permanent Resident Card | Initial issuance or replacement for Special Agricultral Workers (SAW) | November 15, 2005 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Visa to be | 2 Months |

| | | | |
|---|---|---|---|
| | | issued abroad | |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Change of status in the U.S. | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Extension of stay in the U.S. | June 04, 2007 |
| I-129 | Petition for A Nonimmigrant Worker | H-2A - Temporary workers | 15 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-2B - Other temporary workers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-3 - Temporary trainees | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | L - Intracompany transfers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | Blanket L | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | O - Extraordinary ability | September 06, 2007 |
| I-129 | Petition for A Nonimmigrant Worker | P - Athletes, artists, and entertainers | September 06, 2007 |
| I-129 | Petition for A Nonimmigrant Worker | Q - Cultural exchange visitors and exchange visitors participating in the Irish Peace process | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | R - Religious occupation | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | TN - North American Free Trade Agreement (NAFTA) professional | 2 Months |
| I-129F | Petition for Alien Fiance(e) | K-1/K-2 - Not yet married - fiance and/or dependent child | 6 Months |
| I-130 | Petition for Alien Relative | U.S. citizen filing for a spouse, parent, or child under 21 | May 14, 2007 |
| I-130 | Petition for Alien Relative | U.S. citizen filing for an unmarried son or daughter over 21 | July 02, 2006 |
| I-130 | Petition for Alien Relative | U.S. citizen filing for a married son or daughter over 21 | June 04, 2006 |
| I-130 | Petition for Alien Relative | U.S. citizen filing for a brother or sister | February 05, 2001 |
| I-130 | Petition for Alien Relative | Permanent resident filling for a spouse or child under 21 | January 08, 2006 |
| I-130 | Petition for Alien Relative | Permanent resident filling for an unmarried son or daughter over 21 | June 04, 2006 |
| I-131 | Application for Travel Document | All other applicants for advance parole | August 07, 2007 |
| I-140 | Immigrant Petition for Alien Worker | Extraordinary ability | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Outstanding professor or researcher | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Multinational executive or manager | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Schedule A Nurses | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability requesting a National Interest Waiver | April 01, 2006 |
| I-140 | Immigrant Petition for Alien Worker | Skilled worker or professional | April 01, 2006 |

| I-140 | Immigrant Petition for Alien Worker | Unskilled worker | April 01, 2006 |
|---|---|---|---|
| I-212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | Readmission after deportation or removal | 6 Months |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | All other special immigrants | 6 Months |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | July 24, 2006 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change of status to H or L dependents | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change status to the F or M academic or vocational student categories | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change Status to the J exchange visitor category | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All other change of status applications | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of stay for H and L dependents | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of Stay for F or M academic or vocational students | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of Stay for J exchange visitors | June 04, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All other extension applications | June 04, 2007 |
| I-612 | Application for Waiver of the Foreign Residence Requirement | Application for a waiver of the 2-year foreign residence requirement based on exceptional hardship or persecution | May 19, 2007 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of lawful permanent resident conditions (spouses of U.S. citizens and lawful permanent residents | March 01, 2007 |
| I-765 | Application for Employment Authorization | Based on a request by a qualified F-1 academic student. [(c)(3)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on a pending asylum application [(c)(8)] | 30 Days |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application [(c)(9)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on TPS for Honduras/Nicaragua [(c)(19), (a)(12)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on TPS for El Salvador [(c)(19)(a)(12)] | 11 Weeks |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 11 Weeks |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program | 6 Months |
| I-821 | Application for Temporary Protected | El Salvador initial or late filing | July 01, 2006 |

|  | Status |  |  |
|---|---|---|---|
| I-821 | Application for Temporary Protected Status | El Salvador extension | July 01, 2006 |
| I-821 | Application for Temporary Protected Status | Honduras and Nicaragua initial or late filing | July 01, 2006 |
| I-821 | Application for Temporary Protected Status | Honduras and Nicaragua extension | July 01, 2006 |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 6 Months |
| N-600 | Application for Certification of Citizenship | Application for recognition of U.S. citizenship | December 22, 2006 |
| N-643 | Application for Certification of Citizenship on Behalf of an Adopted Child | Application for recognition of U.S. citizenship on behalf of an adopted child | 6 Months |

Print This Page        Back

Home   Contact Us   Privacy Policy   Website Policies   NoFEAR   Freedom Of Information Act   FirstGov

U.S. Department of Homeland Security

# Exhibit F



Home   Contact Us   Site Map   FAQ

Search   

Advanced Search

Services & Benefits   Immigration Forms   Laws & Regulations   About USCIS   Education & Resource   Press Room

Print This Page      Back

# U.S. Citizenship and Immigration Services
## Texas Service Center Processing Dates
## Posted November 14, 2007

The processing times shown below are a tool for our customers to gauge our current processing times. When applications and petitions are completed within our target timeframes, that goal will be shown in the data display.

The processing times shown below are for applications that have just been completed. If you have just filed your application, these timeframes may not reflect how long your application will take to be completed. We encourage you to check this page periodically before inquiring about your case. The processing times are updated monthly.

USCIS has received a significant increase in the number of applications filed. In July and August, nearly 2.5 million applications and petitions of all types were received. This compares to 1.2 million applications and petitions received in the same time period last year. This fiscal year, we received 1.4 million applications for naturalization; nearly double the volume we received the year before. The agency is working to improve processes and focus increased resources, including hiring approximately 1,500 new employees, to address this workload.

As a result, average processing times for certain application types may be longer. In particular, naturalization applications filed after June 1, 2007 may take approximately 16-18 months to process.

We offer a variety of services after you file.  For example, for most kinds of cases you can check the status of your case online.

For more information about when and how to contact us, whether your case is outside our processing time or if there are other issues, please see our customer guide –

Case Services - How do I... know what kind of services are available to me after I file my application or petition?

Service Center Processing Dates for **Texas Service Center** Posted November 14, 2007

| Form | Title | Classification or Basis for Filing | Processing Timeframe |
|------|-------|-----------------------------------|---------------------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance or replacement | 6 Months |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Visa to be issued abroad | 2 Months |

| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Change of status in the U.S. | 2 Months |
|---|---|---|---|
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Extension of stay in the U.S. | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-2A - Temporary workers | 15 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-2B - Other temporary workers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-3 - Temporary trainees | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | E - Treaty traders and investors | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | L - Intracompany transfers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | Blanket L | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | O - Extraordinary ability | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | P - Athletes, artists, and entertainers | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | Q - Cultural exchange visitors and exchange visitors participating in the Irish Peace process | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | R - Religious occupation | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | TN - North American Free Trade Agreement (NAFTA) professional | 2 Months |
| I-131 | Application for Travel Document | All other applicants for advance parole | 3 Months |
| I-140 | Immigrant Petition for Alien Worker | Extraordinary ability | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Outstanding professor or researcher | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Multinational executive or manager | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Schedule A Nurses | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability requesting a National Interest Waiver | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Skilled worker or professional | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Unskilled worker | 6 Months |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | All other special immigrants | October 10, 2006 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 6 Months |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | August 01, 2004 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an entrepreneur who wishes to immigrate to the United States | 6 Months |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change of status to H or L dependents | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change status to the F or M academic or vocational student categories | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change Status to the J exchange visitor category | June 13, 2007 |
| I-539 | Application to Extend/Change | All other change of status applications | June 13, 2007 |

| | Nonimmigrant Status | | |
|---|---|---|---|
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of stay for H and L dependents | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of Stay for F or M academic or vocational students | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Extension of Stay for J exchange visitors | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All other extension applications | June 13, 2007 |
| I-612 | Application for Waiver of the Foreign Residence Requirement | Application for a waiver of the 2-year foreign residence requirement based on exceptional hardship or persecution | January 28, 2007 |
| I-730 | Refugee/Asylee Relative Petition | Petition for accompanying family members of a refugee or an asylee | January 25, 2007 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of lawful permanent resident conditions (spouses of U.S. citizens and lawful permanent residents | April 07, 2007 |
| I-765 | Application for Employment Authorization | Based on a request by a qualified F-1 academic student. [(c)(3)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on a pending asylum application [(c)(8)] | 30 Days |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application [(c)(9)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on TPS for Honduras/Nicaragua [(c)(19), (a)(12)] | 11 Weeks |
| I-765 | Application for Employment Authorization | Based on TPS for El Salvador [(c)(19)(a)(12)] | 11 Weeks |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 11 Weeks |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program | 6 Months |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 6 Months |
| I-829 | Petition by Entrepreneur to Remove Conditions | Removal of lawful permanent resident conditions (immigrant investors) | 6 Months |
| I-829 | Petition by Entrepreneur to Remove Conditions | Removal of lawful permanent resident conditions (immigrant investors) based on PL107-273 | 6 Months |

Print This Page        Back

Exhibit G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Zaigang Liu, | ) | Case No.: 1:07CV00263 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Declaration of Bradley J. Brouillette |
| | ) | |
| Paul Novak, Director, Vermont Service Center | ) | |
| U.S Department of Homeland Security, U.S. | ) | |
| Citizenship and Immigration Services; Emilio | ) | |
| Gonzalez, Director, U.S. Citizenship and | ) | |
| Immigration Services; Robert S. Mueller, III, | | |
| Director, Federal Bureau of Investigation, | | |
| | | |
| Defendants | | |

I, BRADLEY J. BROUILLETTE declare as follows:

1.    I am employed by the United States Citizenship and Immigration Services (hereinafter "USCIS") as a Supervisory Center Adjudications Officer at the Vermont Service Center (hereinafter "VSC"), in St. Albans, Vermont. I have held this position since December 2003. I have been employed by the agency in various capacities since November 1995. I make this declaration based on my personal knowledge and my review of official documents and records maintained by the USCIS. If called to testify, I could and would do so competently.

2.    This declaration is submitted in support of Defendants' motion to dismiss in the case of Zaigang Liu v. Novak et al., 1:07CV00263, now pending before the United States District Court for the District of Columbia. It provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file.

3.    When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks. These checks are conducted both to enhance national security and ensure the integrity of the immigration process. These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. Pursuant to established agency policy, all required security checks must be completed prior to adjudication of the application.

4.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the

2

1    results of an IBIS query are usually available immediately, in some cases information

2    found will require further investigation.  Finally, FBI fingerprint checks provide

3    information relating to criminal background within the United States.  Results are

4    usually received within days and while the vast majority results in no criminal record,

5    positive results may have a direct bearing on the eligibility of an applicant for the

6    immigration benefit being sought.

7    5.    Once USCIS receives an I-485 a file is opened and an electronic record of that

8    application is created.  Much of this initial electronic processing and data entry is

9    automated, including the automatic generation and electronic transmission of a FBI name

10    check request in FBIQUERY, the FBI repository and tracking system for FBI Name

11    Check requests.   Once the initial file creation and processing of an I-485 application is

12    complete, each file is placed on an I-485 pending shelf for processing and adjudication in

13    chronological order according to date of receipt.

14

15    6.    Due to bi-specialization, the VSC no longer accepts any new I-485 applications.  All

16    pending cases being held for FBI name and date of birth check clearance and Visa

17    Availability have been sent to the Texas Service Center.  The VSC has retained

18    approximately 15,000 pending cases in which the adjudicative process had already begun

19    and the adjudication of those cases will be completed at the VSC.

20

21    7.    VSC periodically runs an electronic report in FBIQUERY system for all files on the I-

22    485 pending shelf to confirm the successful transmission of the FBI Name Check request

23    and to identify those applications that have received responses from the FBI name checks

24    and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests

25    that have been received by the FBI but have not yet been completed are indicated by a

26    notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will

27

3

1   be indicated by various entries depending on the result, including No Record, Positive

2   Response, etc.

3   8.   This report will also identify those I-485 applications that have received a "No Data" or

4   "Error" response in FBIQUERY indicating a problem with transmission of the name

5   check request from USCIS to the FBI.  If such a problem is reported, the FBI name check

6   requests will then be initiated a second time and resent manually or electronically to the

7   FBI for a response.  In this way USCIS ensures that the FBI has in fact received all

8

9   requests for name checks.

10  9.   All files on the FBI Name Check Shelf are audited regularly in order to identify those in

11  which a response from the FBI has been received.  This audit is conducted at least every

12  three weeks or more often.  In this manner the agency ensures that as FBI responses are

13  received, files are expeditiously released for adjudication.  FBIQUERY reports do not

14  provide USCIS with any indication as to what information the FBI may have relating to a

15  particular alien, whether an FBI investigation into the particular alien has been

16  undertaken, or whether there are national security concerns relating to that alien.

17

18  10.  For most applicants, USCIS can quickly determine if there are criminal or security

19  related issues in the applicant's background that affect eligibility for immigration

20  benefits.  However, due both to the sheer volume of security checks USCIS conducts,

21  and the fact that USCIS must await responses from the FBI or other relevant agencies

22  that conduct some of the required security checks, some delays on individual

23  applications are unavoidable and may be lengthy.  Moreover, in some cases a

24  background or security check will reveal that positive (derogatory) information on the

25  subject alien is possessed by some agency other than USCIS without necessarily

26  revealing the substance of that information.  In such cases, USCIS works closely with

27  the other law enforcement or intelligence agencies to obtain all available information

4

concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency.   It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

11.    The agency's policy for requesting expedited security checks requires that the applicant meet one of the following criteria:

    1.   Military Deployment.

    2.   Age-out cases not covered by the Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa Program.

    3.   Compelling reasons provided by the requesting office such as critical medical conditions.

    4.   Loss of Social Security benefits or other subsistence at the discretion of the Director.

U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

12.    USCIS reports the average processing times for specific applications and petitions on the USCIS website.  This information reflects only average processing times on the date the information is published.  Average processing times fluctuate widely and will sometimes even regress for a specific form type due to a number of factors, including a reallocation of agency resources, reordering of the agency's priorities, and other reasons. Additionally, not every application will require the same level of inquiry.  Some may

5

require a more detailed level of review and or investigation from either the USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit sought to national security concerns. Accordingly, even when it appears that the adjudication of a particular application is outside the average processing time, this does not establish that the delay is unreasonable or even due to factors within the control of USCIS.

13. The FBI has an established process of processing FBI Name Check requests from USCIS chronologically based on the date the request is forwarded. As stated above, certain requests can be expedited if they meet specific expedite criteria. However, it is important to note that whenever a particular application or petition receives expedited processing and is moved up in the queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. There is no statutory or regulatory time limit for the adjudication of I-485s. Moreover, an alien who has applied for adjustment of status may apply for and obtain employment authorization for the entire time his or her application is pending. Most applicants for adjustment of status may also apply for and obtain advance parole to enable them to travel abroad during the pendency of their application. Thus, applicants for adjustment of status are not as adversely affected by delays in the adjudication of their applications as are aliens filing for other immigration benefits.

14. In my capacity as a Supervisory Center Adjudications Officer at the VSC, I have access to the official files and records of the USCIS. I have reviewed the system records for plaintiff LIU, Zaigang, A97 486 586. The record reflects that on July 23, 2003, plaintiff Liu filed an application for adjustment of status to permanent resident on Form I-485.

6

1         Plaintiff seeks adjustment as a derivative beneficiary on an approved I-140 employment

2         based visa petition for his spouse Lu Zhang.  To date, plaintiff's application remains

3         pending the completion of security checks.  Once the required security checks are

4         completed, the plaintiff's application will be adjudicated.

5

6 15.     Because the plaintiff's case does not meet one of the above-mentioned expedite criteria,

7         the agency is unable to request an expedite of the security check clearance on his behalf.

8         For this reason the USCIS cannot adjudicate plaintiff's I-485 application for adjustment

9         of status until such time as all security checks are complete.

10

11         I declare under penalty of perjury that the foregoing is true and correct.  Executed this

12     23rd day of April, 2007 at St. Albans, Vermont.

13

14

15

16                               Bradley J. Brouillette

17                               Supervisory Center Adjudications Officer
                                  Vermont Service Center

18

19

20

21

22

23

24

25

26

27

7



*Press Office*
**U.S. Department of Homeland Security**



U.S. Citizenship
and Immigration
Services

# Fact Sheet

April 25, 2006

### Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

---

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check**— IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check**—FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks**—FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ZIAGANG LIU,

       Plaintiff,

       v.

PAUL NOVAK,
       et al.,

       Defendants.

Case No:
07-CV-00263

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Zaigang Liu, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies. The Central
Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.
The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower
Administration.  That executive order addresses personnel security issues and mandates National
Agency Checks as part of the pre-employment vetting and background investigation process for
prospective Government employees.  The FBI performs the primary National Agency Check
conducted on all United States Government employees.  From this modest beginning, the
Program has grown exponentially, with more and more customers seeking background
information from FBI files on individuals before bestowing a privilege, such as Government
employment or an appointment, a security clearance, attendance at a White House function, a
"green card" or naturalization, admission to the bar, or a visa.  More than 70 federal, state, and
local agencies regularly request FBI name searches.  In addition to serving our regular
Government customers, the FBI conducts numerous name searches in direct support of the FBI's
counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has
acquired in the course of fulfilling mandated law enforcement responsibilities.  The records
maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files
compiled for law enforcement purposes.  This system consists of a numerical sequence of files
broken down according to subject matter.  The subject matter of a file may relate to an
individual, organization, company, publication, activity, or foreign intelligence matter.  Certain
records in the system are maintained at FBI Headquarters.  Records which are pertinent to
specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the
FBI's General Indices.  The General Indices are arranged in alphabetical order and consist of
indices on various subjects, including the names of individuals and organizations.  Only the
information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)    Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)    Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)   Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)   When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

### RESOLUTION RATE

(13)    Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

5

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent -- or over 440,000 -- resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors; including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Zaigang Liu was received by the FBI from USCIS on or about March 30, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _13th_ day of April 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

# Exhibit I
# Proposed Order

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OAM PARKASH, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. _____ |
| | ) |
| CONDOLEEZZA RICE, SECRETARY | ) |
| OF STATE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>ORDER</u>

Upon consideration of Plaintiff's Application for Preliminary Injunction, and the opposition filed thereto, and the Court having considered the entire record herein, it is hereby,

**ORDERED** that Plaintiff's Application for Preliminary Injunction will be heard on _____, December ___, 2007 at _____ in Courtroom _____.

The Plaintiff and Defendants are hereby **ORDERED** to appear at the time listed above for a hearing on the merits of Plaintiff's Application for Preliminary Injunction.

Dated this _____ day of _____, 2007.


_____
United States District Judge

# Exhibit J
# Proposed Order

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **OAM PARKASH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. _____** |
| | ) | |
| **CONDOLEEZZA RICE, SECRETARY OF STATE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## ORDER

Upon consideration of Plaintiff's Application for Preliminary Injunction, and the opposition filed thereto, and the Court having considered the arguments of counsel and the entire record herein, it is hereby,

**ORDERED** that Plaintiff's Application for Preliminary Injunction is

_____.

Defendant Department of State is hereby **ENJOINED** from releasing one EB-2 immigrant visa number allotted for an Indian national and same shall be reserved for Plaintiff's adjustment application.

Defendant Federal Bureau of Investigation is hereby **ENJOINED** from processing Plaintiff's NNCP name check using its normal processes and is further ORDERED to complete Plaintiff's NNCP check within thirty (30) days of the date of this Order.

Dated this _____ day of _____, 2007.


_____
United States District Judge